**In re GANDER MOUNTAIN, INC., Debtor.**

**GANDER MOUNTAIN, INC., as Debtor in Possession, and the Creditors' Committee of Gander Mountain, Inc., Plaintiffs,**

**v.**

**IMPACT INDUSTRIES, INC., a Wisconsin corporation, Defendant.**

**Bankruptcy No. 80–03050.
Adv. No. 81–1231.**

United States Bankruptcy Court,
E.D. Wisconsin.

April 17, 1983.

David A. Erne, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C., Milwaukee, Wis., for plaintiff creditors' committee.

Richard H. Casper, Foley & Lardner, Milwaukee, Wis., for debtor.

Roger G. Schnitzler, Van Metre, Hanson, Clarke, Schnitzler & Meyer, Madison, Wis., for defendant.

## MEMORANDUM DECISION

C.N. CLEVERT, Bankruptcy Judge.

This was one of many preference actions brought by Gander Mountain, Inc., debtor, and its creditors' committee following confirmation of the debtor and the committee's joint reorganization plan. In this case, the plaintiffs sought to recover $17,628.50 in preferential payments from Impact Industries, Inc. Although Impact Industries acknowledged that it received preferences, it argued that the creditors' committee should be dropped as a party plaintiff because (1) it was not an indispensable party and (2) its presence in the case deprived Impact Industries of the normal give and take of compromise and settlement that existed in most law suits. Impact Industries also argued that it was entitled to apply its payments from Gander Mountain in a manner contrary to its instructions so that the payments would fit within the preference exception of 11 U.S.C. § 547(c)(2). Alternatively, it asked the court to find that some of its debts were incurred within 45 days of Gander's Chapter 11 petition and paid in the ordinary course of business, so as to fall within the same exception. Finally, Impact argued that it should not be required to disgorge any payments in excess of its anticipated dividend under the confirmed reorganization plan. The parties have agreed to have the court decide these issues on their briefs.

On September 30, 1980, October 15, 1980, and November 11, 1980, Gander Mountain wrote checks to Impact Industries and directed that they be applied to certain invoices for inventory which had been previously delivered. The checks and designated invoices were as follows:

| Check No. | Date of Check | Amount of Check | Invoice No. on Check | Amount of Invoice | Date of Invoice |
|---|---|---|---|---|---|
| 3477 | 9–30–80 | $2,527.75 | 6610 | $1,749.00 | 7–14–80 |
|  |  |  | 6611 | 778.75 | 6–30–80 |
| 3672 | 10–15–80 | $5,543.36 | 6642 | 1,627.86 | 8–15–80 |
|  |  |  | 6692 | 1,654.00 | 8–15–80 |
|  |  |  | 6868 | 635.70 | 8–18–80 |
|  |  |  | 6880 | 1,625.80 | 8–22–80 |
| 3897 | 11–11–80 | 9,557.39 | 6879 | 1,048.50 | 8–21–80 |
|  |  |  | 6858 | 1,048.50 | 8–18–80 |
|  |  |  | 6693 | 1,660.00 | 8–28–80 |
|  |  |  | 6968 | 1,711.25 | 9–09–80 |
|  |  |  | 7036 | 813.25 | 9–17–80 |
|  |  |  | 7075 | 1,989.25 | 10–22–80 |
|  |  |  | 7248 | 304.65 | 10–22–80 |
|  |  |  | 6863 | 787.99 | 8–28–80 |
|  |  |  | 6939 | 194.00 | 10–22–80 |

Each of the aforementioned checks had been paid when the debtor filed its Chapter 11 petition on December 9, 1980.

The official unsecured creditors' committee and the debtor jointly proposed a plan of reorganization which was confirmed on August 18, 1981. The plan provided in pertinent part that class C creditors would receive 55% of the first $1 million in preferences recovered by the debtor and 100% of all preferences over $1 million recovered by the committee or the debtor.[1] The plan also provided for the continuation of the creditors' committee until the debtor had fully performed its obligations under the plan.[2]

## DISCUSSION

In a brief filed by the creditors' committee, it was conceded that if Impact Industries followed Gander Mountain's instructions regarding the application of payments, $2,487.90 of the payments received by Impact Industries would fall within the

preference exception stated in § 547(c)(4). Accepting that as true, the court only needed to concern itself with the remaining payments totalling $15,140.60.

After reviewing Impact Industries' arguments for dropping the creditors' committee as a party plaintiff, the court has found that there are no bases for granting the motion. The thrust of Impact Industries' argument was that the creditors' committee was not a necessary or indispensable party under Fed.R.Bankr.P. 719 and Fed.R.Civ.P. 19. Furthermore, Impact Industries argued that the presence of the creditors' committee in the case somehow prejudiced its rights.

A creditors' committee is clearly a party in interest with a right to appear on any issues raised in a Chapter 11 case.[3] Furthermore, a creditors' committee has standing, in the proper circumstances, to bring an action against a creditor even though the debtor is not an active party to the action.[4]

1. Article V Plan of Reorganization

Class C creditors in this case were primarily trade creditors and creditors whose claims may have arisen from repayment of preferences. See Appendix for further summary of the reorganization plan as it applied to Class C creditors.

2. Article XI Plan of Reorganization.

3. 11 U.S.C. § 1109(b)

4. *The Liberal Market, Inc. by the Official Creditors' Committee v. Malone & Hyde, Inc. (In re Liberal Market, Inc.),* 14 B.R. 685 (Bkrtcy.S.D. Ohio 1981);

*Committee of Unsecured Creditors v. Monsour Medical Center (In the Matter of Monsour Medical Center),* 5 B.R. 715, 6 Bankr.Ct.Dec. (CRR) 886, 2 Collier Bankr.Cas.2d (MB) 1363 (Bkrtcy.W.D.Pa.1980);

*Security Bank & Trust v. Cloud Nine, Ltd. (In re Cloud Nine Ltd.),* 3 B.R. 199, 6 Bankr.Ct.Dec. (CRR) 26, Bankr.L.Rep. (CCH) ¶ 67383 (Bkrtcy. D.N.M.1980).

*Contra: Segarra v. Banco Central Y Economias (In re Segarra),* 14 B.R. 870, 8 Bankr.Ct.Dec.

■ A review of the record and briefs in this case disclosed that the creditors' committee and the debtor filed a joint plan which provided that class C creditors were to receive all preferences in excess of $1 million recovered by the debtor or the creditors' committee. Thus, the reorganization *obviously* contemplated that the creditors' committee would assist, if not completely take over, the task of recovering preferences, and rightfully so. As the creditors' committee in its brief observed: "It is the Committee [on behalf of class C creditors] which has a real stake in the outcome of this action..." now that more than $1,620,-064.53 in preferences has been recovered in the Chapter 11 case.[5] Furthermore, the debtors' motivation to vigorously pursue preferences could understandably wane after $1 million in preferences was collected.

The creditors' committee suggested that the court invoke its powers under 11 U.S.C. § 105(a) to authorize it (the Committee) to prosecute this action. While that did not appear to be necessary in light of this court's finding that the recovery of preferences by the creditors' committee was implicit in the confirmed plan, an order specifically granting the creditors' committee full authority to sue to recover preferences on behalf of the debtor could have been entered prior to the effective date of the reorganization plan.

There was no need to address Impact Industries' contention that it was prejudiced by the creditors' committee's appearance in this adversary proceeding, except to say that this court was not made aware of any duty that a party has to compromise a lawsuit. Furthermore, an affidavit filed by Impact Industries asserting that the creditors' committee was opposed to compromising its demand in this action failed to demonstrate how, if at all, Impact Industries had been prejudiced by the committee's conduct.

### Application of Payments

■ The next issue raised by Impact Industries was whether or not it was entitled to apply payments contrary to Gander Mountain's written instructions. The argument advanced was that despite notations on Gander Mountain's checks as to how its payments should be applied, Impact could apply the payments to its most recent unpaid invoices and thereby allow the payments to be treated as "substantially contemporaneous exchange(s)" within the meaning of 11 U.S.C. § 547(c)(1).[6] The creditors' committee responded with two arguments. First, the committee argued that under the application of payments doctrine, stated in *Moser Paper Co. v. North Shore Publishing Co.,*[7] and its Wisconsin forerunners, Impact was precluded from applying Gander's payment as it pleased. Secondly, the committee argued that Gander's instructions conclusively demonstrated that Gander did not intend to engage in a substantially contemporaneous exchange.

The court has found both arguments persuasive. The *Moser* case, which this court followed in *C. Bundy Jr. Inc. v. Karsten (In re Karsten)*[8] said that:

Where a debtor owes a creditor multiple debts, a payment by the debtor should be applied to one or another of the debts as the debtor directs. *F.A. Patrick & Co. v. Deschamp,* 145 Wis. 224, 129 N.W. 1096 (1911). Where the debtor fails to direct the application of the payment to a particular debt, the creditor may apply the payment as he chooses. *Earl v. Napp,*

(CRR) 339, Bankr.L.Rep. (CCH) ¶ 68390, 2 Collier Bankr.Cas.2d (MB) 552 (Bkrtcy.D.P.R. 1981).

5. Plaintiff's brief, p. 4, Feb. 19, 1982. See also, Order Approving Satisfaction of Preference Liability, February 16, 1982.

6. This subsection provides that:
The trustee may not avoid under this section a transfer—
(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to, or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
(B) in fact a substantially contemporaneous exchange;

7. 83 Wis.2d 852, 266 N.W.2d 411 (1978)

8. 16 B.R. 704 (Bkrtcy.E.D.Wis.1982)

218 Wis. 433, 261 N.W. 400 (1935), *Debelak Bros., Inc. v. Mille,* 38 Wis.2d 373, 157 N.W.2d 644 (1968). If neither the creditor nor the debtor applies the payment, then the court makes the application in accordance with equitable principles. *Theiler v. Consolidated Indemnity & Ins Co.,* 213 Wis. 171, 250 N.W. 433 (1933).[9]

Given the facts presented in this adversary proceeding, there is no doubt that Impact was bound to apply Gander's payments as it directed. Although the record failed to disclose whether Impact's invoices were dated as of the day it sold goods or later, the fact that Gander wrote its checks more than 45 days after being invoiced clearly indicated that the transactions were not intended to be substantially contemporaneous exchanges. It followed that § 547(c)(1) did not save Gander's transfer from avoidance.

## RETURN OF ANTICIPATED DIVIDENDS

■ One of the elements of a voidable preference, as provided in 11 U.S.C. § 547(b)(5), is that the transfer

... enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Impact, therefore, argued that it should not have to repay any amount it *would* receive under Gander's reorganization plan—which it concluded was 60% of the payments it received.[10] One major flaw in Impact's argument was that there was no guarantee that it would receive dividends equal to 60% of its preference. Furthermore, there was no guarantee that the plan would be fully consummated or that Impact would have funds to repay its preference in the distant future. Indeed, the absence of those guarantees meant that Impact might retain more than its share of the class C distribution and thereby frustrate the purpose of § 547(b)(5).[11] Furthermore, Impact ignored § 502(d) [12] of the Bankruptcy Code which bars the allowance of a preferred creditor's claim unless the creditor returns the preference.

The Seventh Circuit Court of Appeals addressed this issue in *Barash v. Public Finance Corporation,* 658 F.2d 504, 509 (7th Cir.1981) and analyzed the effect of § 547(b)(5):

... Section 547(b)(5) is directed at transfers which enable creditors to receive more than they would have received had the estate been liquidated and the disputed transfer not been made. As long as the transfers diminish the bankrupt's estate available for distribution, creditors who are allowed to keep transfers would be enabled to receive more than their share. *The creditors in the instant case must account for the payments they received during the 90 days preceding the bankruptcy filing or they will ultimately receive a larger share of their unsecured claims than other unsecured creditors.* (Emphasis added)

In so ruling, the Court of Appeals, in effect, declared that unless a preference exception would apply, a preferred creditor must dis-

**9.** 83 Wis.2d at 857–858, 266 N.W.2d 411.

**10.** Summary of Plan.

**11.** If the court were to conclude that § 547(b)(5) allows creditors to retain their preferences until final dividends are distributed, it is conceivable that preference recoveries will no longer be available to fund a Chapter 11 debtor's operations before or after confirmation of a reorganization.

**12.** 11 U.S.C. § 502(d) provides that:

Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

gorge *all* payments it has received.[13] But this requirement is not absolute, for the Supreme Court ruled in *Page v. Rogers*[14] that a preferred creditor in a liquidation bankruptcy under the 1898 Bankruptcy Act should be allowed to prove his claim against the bankruptcy estate and set off his dividend from the sum he was required to turn over to the trustee. In its opinion the Court said:

> In view of the fact that this [preference] suit was brought in the bankruptcy court itself, and a final decree is to be entered by the judge of that court, it is entirely practicable to avoid the circuitous proceeding of compelling the defendant to pay into the bankrupt [sic] court the full amount of the preference which he has received, and then to resort to the same court to obtain part of it back by way of dividend. The defendant may be permitted, if he shall be so advised, to prove his claim against the estate of the bankrupt, and the bankrupt court then may settle the amount of the dividend coming to him, and the final decree may direct him to pay over the full amount of his preference, with interest, less the amount of his dividend.[15]

This very practical manner of resolving preference suits in bankruptcy courts must, of course, be limited to those instances where the preferred creditor is entitled to receive a dividend, the dividend can be quickly and easily determined, and the dividend is immediately payable. Applying that to the case before this court, it was found that two dividends had been paid to class C creditors and that additional dividends of undeterminable size were to be made over a span of as many as eight years.

So, except for the dividends which were previously awarded, it would have been impractical, if not impossible, to determine the defendant's total future dividends. The court, therefore, has concluded that the defendant must disgorge all sums in excess of its proportionate share of the dividends it may be due. The plaintiffs are entitled to judgment on their complaint and the parties are directed to submit further proofs with respect to the defendant's claim against the debtor's Chapter 11 estate and all dividends which are now payable on that claim.

## APPENDIX

Excerpt From Disclosure Statement Approved by the Court on July 10, 1981, beginning at p. 12

\* \* \*

(c) Class C creditors, which are the majority of all creditors, and are largely trade creditors, will receive $2,175,800 in cash and a note, with certain adjustments described in the Plan. (The dollar amount of $2,175,800 represents 55% of the $3,856,000 of accounts payable of the Debtor reflected on the December 31, 1980 balance sheet of the Debtor, with the addition of $100,000 for claims not reflected on the balance sheet. No adjustment will be made to the $2,175,800 amount to be received even if the amount of claims ultimately filed is greater than $3,956,000.)

One of the adjustments to this dollar amount is for preferences collected, which are expected to be approximately $1.2 million. Those who repay preferences can be expected to file additional claims for the amounts of the preferences repaid. There-

---

**13.** To illustrate its point in *Barash,* the court gave the following example:

> . . . [I]f upon liquidation unsecured creditors would be paid 20% of their claims (based on remaining assets and scheduled claims after secured creditors are paid), to defeat a trustee's avoidance rights a creditor would have to show only that the payments received during the 90-day period do not exceed 20% of the creditor's unsecured claim. This sole comparison, however, does not account for what happens thereafter. If the payments

made were less than 20%, there would be no preference and the creditor would keep the payments and later also receive a pro-rata share of the balance of his claim. In the final analysis, this would violate the fundamental principle of equal distribution among a class of claims. 658 F.2d at 508–509.

**14.** 211 U.S. 575, 29 S.Ct. 159, 53 L.Ed. 332 (1909).

**15.** *Id.* at 581, 29 S.Ct. at 161.

fore, the Plan provides that 55% of the amount of all preferences collected up to $1 million will be added to the amount of $2,175,800, so that the percentage payment ratio will be approximately preserved, and the remaining 45% will be paid to the Debtor. Since the feasibility of the Plan depends in part upon repayment of preferences approaching $1,000,000, the Plan provides that if preferences are less than $1 million, the amount of $2,175,800 is decreased by 45% of that deficiency. On the other hand, 100% of the amount of preferences collected in excess of $1,000,000 will be added to the $2,175,800 amount, and the percentage distributed to creditors of this class will then exceed the percentage otherwise payable. As of July 10, 1981 recipients of preferences aggregating approximately $1,050,000 had agreed in writing to satisfy preference claims by shipments of merchandise, so the percentage distributed to Class C creditors may exceed 55%.

The Plan provides a second adjustment to the $2,175,800 amount, which will be made if certain administrative expenses, and certain business losses of the Debtor, as described in the Plan, exceed $500,000. However, it appears nearly certain that those expenses and losses will not exceed $500,-000.

The Class C creditors will receive $500,-000 upon the later to occur of November 15, 1981 and the confirmation of the Plan, and the remaining amount due will be paid in four equal installments on the annual anniversary dates of the down payment, with a possible adjustment for preference collections of less than $1 million, as provided in the Plan.

Class C creditors will also participate in future profits of the Debtor, up to a maximum amount of $500,000, and will receive 10% of the gain on any sale in the eight years following confirmation of the Plan, of any substantial portion of the assets of the Debtor not in the ordinary course of business, or of common stock of the Debtor, all as further provided in the Plan.

While the Debtor believes that it will be profitable in the future and that the Class C creditors will therefore receive additional payments because of this provision of the Plan, the Debtor has not prepared projections of future profits that are believed sufficiently reliable to merit disclosure and the exact amount of the additional future payments therefore cannot be projected.