**In re COAST CARLOADING COMPANY, a California corporation, Debtor.**

**No. LA 80–12407–JA.**

United States Bankruptcy Court, C.D. California.

Oct. 26, 1983.

Steven C. Shuman, Engstrom, Lipscomb & Lack, Attys. at Law, Los Angeles, Cal., for Underwriters at Lloyds, London signatory to Policy No. AIR 1054 and Aetna Ins. Co.

Andrew F. Leoni, Slate & Leoni, Los Angeles, Cal., for debtor.

Douglas Kappler, Robinson, Wolas & Diamant, Century City, Los Angeles, Cal., for official creditors' committee.

MEMORANDUM OF DECISION

JOHN D. AYER, Bankruptcy Judge.

Coast Carloading Co., the debtor-in-possession in this Chapter 11 case, is a freight hauler. Coast maintained cargo liability insurance to pay customers' claims in the event of loss. During two years, the policy was written by Underwriters at Lloyds ("Lloyds"). In another year, Coast got the insurance from Aetna Insurance Company ("Aetna"; collectively, the "insurers"). The insurers have spent time and effort post-Chapter to adjust pre-Chapter

claims against Coast. The insurers now apply for interim payment of their adjustment expenses as a priority administrative expense. The insurers argue that payment was specifically authorized by an earlier order in this case and that, in any event, the request is proper and should be allowed on its merits.

The official creditors' committee ("committee") opposes the application. The committee argues the prior order is not binding on it because the committee was not notified of the hearing that led to the earlier supposed order. The committee also argues that, in any event, the request is improper and should be disallowed on the merits. Coast also opposes the request. Coast, unlike the committee, was party to the hearing that led to the prior order. Coast's counsel at this hearing said that he "must have simply overlooked" the earlier order. Except for this avowal, Coast makes no effort to explain away that order, but nonetheless insists that the claim is improper.

I find that the insurers are entitled to an administrative claim for adjusting expenses, though not in the amount requested, based on the prior order and despite the fact that the committee did not participate in the prior hearing.

I

Coast filed its Chapter 11 petition on November 28, 1980, scheduling some 2,500 pre-Chapter creditors. Coast filed a plan of reorganization on October 7, 1982. The plan provides that unsecured creditors will receive a sum equal to 70 percent of their claims, or $1,750,000, whichever is greater, to be paid without interest as a percentage of gross over five years. Confirmation is pending. At the request of Coast and the creditors' committee, I have deferred the hearing on confirmation pending the resolution of this dispute.

From the court's records, it appears that Coast listed neither of the insurers as creditors when it filed its petition in 1980. It listed Aetna on the bankruptcy schedules which it filed on January 8, 1981, but with a wrong address. It did not list Lloyds at all.

Consequently, neither of the insurers filed claims before the bar date (which was March 4, 1981). But during the same time period, the insurers discovered that they would be exposed to liability on their cargo policies. They learned belatedly of the Chapter 11 case. Ultimately, they prevailed on the court for permission to file their claims late.

The standard cargo liability policy, written alike by Lloyds and Aetna, contains a "$5,000 deductible" clause, providing that Coast is liable for individual claims up to the amount of $5,000. The dispute in this case involves an endorsement on that $5,000-deductible clause, specifying the disposition of deductible claims in the event the insured becomes insolvent. The endorsement provided that in the event the insured becomes insolvent, then the insurer must pay the claims, with a right over against the insured.

The insurers retained Steven C. Shuman, a lawyer in the firm of Engstrom, Lipscomb & Lack ("Shuman") to represent them in the bankruptcy court. They retained Edward Farman of the firm of Schindel, Cooper & Farman ("Farman") to adjust the claims. Farman is a lawyer, but Shuman in oral argument insisted that Farman was working as an adjuster and not as a lawyer.

Taking both insurers together, it appears that Farman began with 2,385 cargo claims, totaling $538,643.13. So far, he has disposed of 1,667, with an original face value of $338,161.33. He has reduced them down to $122,197.24—a reduction of $215,964.09, bringing the claims so far adjusted down to 36.14 percent of their original total. The insurers now assert an unsecured Chapter 11 claim for the reduced sum. The remaining 718 unadjusted cargo claims have a face value of $200,481.80. The insurers also assert an unsecured Chapter 11 claim for that amount, subject to a contingent right of recoupement in favor of Coast if and when these cargo claims are settled for less than face. Taking the reduced total of the adjusted cargo claims and the whole total of the unadjusted cargo claims, that would make a total unsecured Chapter 11 claim of

$322,679.04. Strictly speaking, the validity of this unsecured Chapter 11 claim is not before me at this time, though I must say it is not at all obvious that the insurers in fact have a right to claim for the face value of the unadjusted amount. *Cf.* Bankruptcy Code § 502(c), 11 U.S.C. § 502(c) (Supp. IV 1981) (estimation of contingent or unliquidated claims). Be that as it may, making the assumptions most adverse to the estate, it appears that Farman has already reduced the total unsecured liability for these cargo claims down to 59.91 percent of its original total. (For an analysis of the claims, see the accompanying chart, "Claims.")

In recompense for these services, the insurers now seek $81,401.96—$65,893.53 in adjusting expenses and $15,508.43 in related legal expenses. Putting the point another way, the insurers are seeking payment of $81,401.96 as priority administrative expenses for effecting a reduction of the unsecured Chapter 11 claims by $215,964.09. (For an analysis of the request, see the accompanying chart, "Administrative Expense Request.") The committee and Coast oppose the request arguing, *inter alia,* that a claim of this sort should not be treated as a priority administrative expense claim. The insurers assert that the administrative characterization is proper. But the insurers argue that, in any event, the issue was settled by prior order of this court. It is to this order that I now turn.

## II

I find that there was indeed a prior order allowing adjustment expenses as an administrative claim. Superficially, it might seem that this ought to be a fairly straightforward proposition—either there is an order or there is not. But Coast argued for disallowance in the face of the alleged prior order. And, in fact, the record is somewhat cloudy, and so it may be desirable that I spell out just why I find as I do.

I begin with a chronology.[1] As I suggested above, the insurers got into this case late, and rather tangentially. They did

not really grasp that they had a bankruptcy problem until after the passage of the claims deadline. Indeed, Shuman's first major foray in the case was to seek a ruling that the claims were timely filed. But Shuman did more than that. In this initial pleading, he sought also to get a declaration that the claim was entitled to priority as an administrative expense.

For present purposes, there were at least two difficulties with this approach. First, Shuman's procedure was, to say the least, unorthodox. Taking the record as a whole, it appears that what he wanted was to get court approval for the employment of a professional adjuster. Normally, such an appointment would be made at the request of a trustee or committee, pursuant to Bankruptcy Code § 327, 11 U.S.C. § 327 (Supp. IV 1981); *cf.* Bankruptcy Code § 1103(a), 11 U.S.C. § 1103(a) (Supp. IV 1981). Compensation in such a situation would be limited by Bankruptcy Code § 330, 11 U.S.C. § 330 (Supp. IV 1981). The present request, in that context, could be thought of as an application for interim compensation under Bankruptcy Code § 331, 11 U.S.C. § 331 (Supp. IV 1981).

Failure to approach the matter that way may not have been fatal (indeed I hold it was not fatal). But it was sufficiently distinctive to be misleading. A related difficulty was the pleading itself. As structured, the pleading had the effect of focusing attention on the late-claim issue and distracting attention from the administrative expense issue. Specifically, Shuman's pleading was entitled "NOTICE OF MOTION AND MOTION FOR DETERMINATION THAT CLAIMS TIMELY FILED AND TO CONFIRM PAYMENTS FOR ADJUSTMENT OF CLAIMS AS EXPENSES OF ADMINISTRATION; POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATIONS OF BYRON F. FELLOWS, IV, STEVEN C. SHUMAN and WALTER COGGESHALL." In supporting memoranda, Shuman dis-

---

1. While there is only one bankruptcy "case" here, the fact is that another bankruptcy judge heard all matters in the case prior to August 31, 1983.

cussed the administrative expense issue. But he addressed most of his attention to the issue of the alleged late filing which was undoubtedly paramount in his mind. Counsel for Coast in his response evidently addressed the late-claim issue only.

The matter was heard on December 21, 1981. The judge by letter to counsel dated January 19, 1982, announced that he was deciding the matter in favor of the insurers. He said that "the equitable powers of this court should be exercised to permit the claims of [the insurers] to be filed as requested in the moving papers." The letter said nothing about administrative expenses. The letter directed that counsel submit findings of fact, conclusions of law and an order.

Shuman responded by submitting 11 findings of fact, three conclusions of law, and a two-paragraph order. In this submission he dealt with the late-claim issue, but he also specifically addressed the issue of administrative expenses. Finding No. 11 provided: "That independent adjustment of the cargo will reduce the amount paid to the cargo claimants by the Insurers and, consequently, will reduce the amount the Debtor will have to reimburse the Insurers, thereby preserving the Bankruptcy estate and benefiting the Debtor and all other creditors." Conclusion No. 3 provided: "The Court's equitable powers likewise include the power to allow as expenses of administration costs incurred that inure to the benefit of the estate by preserving assets." The second paragraph of the order provided "that the costs of adjusting the cargo claims falling within the policy deductible are held to be expenses of administration." The order, to-

gether with the findings of fact and conclusions of law, was entered February 18, 1982.

Under the circumstances, I think it is fair to infer that counsel for Coast—and, possibly, also the Court—did not focus primary attention on the administrative expense issue. Counsel for Coast now says he has no recollection of the matter, and said at the hearing on this motion that he "must have simply overlooked" the earlier order. I think he is probably being too hard on himself. While the matter of administrative expenses was apparently subordinate to the concern over the bar date, the matter does seem to have been ventilated at the prior hearing. I think on the record Shuman presented the issue fairly, however inelegantly, and his clients are entitled (at least vis-a-vis Coast) to whatever protection the order may afford.[2]

### III

This may dispose of the issue insofar as it concerns Coast. But the committee adds an additional objection. The committee argues that it cannot be bound by the prior order, because it was not privy to that order. I reject the committee's objection, for two reasons. First, on this issue the interest of Coast and the interest of the committee can fairly be regarded as identical, and so it is fair to assume that Coast represented the interest of the committee at the prior hearing. Second, the committee at the most recent hearing had a chance to raise every objection that it might have raised at the earlier hearing. And having heard all that the committee has to say on the issue, I nonetheless find that it was proper to order that the adjuster's fees be treated as an administrative expense.

2. One further piece of evidence supports the conclusion that the debtor and the court were not focusing attention on the administrative expense issue. It appears from the record that another insurance company, Northwestern ("Northwestern") found itself in the same position as Lloyds and Aetna, and proceeded on a parallel, though independent, path in the same case. Specifically, Northwestern sought approval to file its claim late, and also sought allowance of adjusting costs as an administrative expense. The court permitted recognition of the claim, but denied the request for approval as an administrative expense "on the grounds that it is not yet ripe and without prejudice to being renewed at an appropriate time hereafter." This order was entered on August 5, 1981, some six months prior to the order in this case. It is impossible to tell just what to infer from these seemingly inconsistent orders. One possibility is that Coast and the court gave the matter more scrutiny in the Northwestern case than they did in this one.

## A

The beginning point is the role of the committee. The Code expressly authorizes a creditors' committee in a Chapter 11 case. Bankruptcy Code § 1102(a), 11 U.S.C. § 1102(a) (Supp. IV 1981).[3] This committee was appointed on January 7, 1981. The Court approved the appointment of counsel for the committee on July 9, 1981. The statute gives the committee broad powers. Bankruptcy Code § 1103(c), 11 U.S.C. § 1103(c) (Supp. IV 1981); *see generally* DeNatale, *The Creditors' Committee Under the Bankruptcy Code—A Primer,* 55 Am. Bankr.L.J. 43 (1981). Consistent with the exercise of these powers, the committee is almost certainly entitled to appear and be heard on a matter such as this one. *See* Bankruptcy Code § 502(a), 11 U.S.C. § 502(a) (Supp. IV 1981; Bankruptcy Code § 1109(b), 11 U.S.C. § 1109(b) (Supp. IV 1981); Bankr.R. 2018, *In re Gander Mountain, Inc.,* 29 B.R. 260, 10 B.C.D. (CRR) 605 (Bkrtcy.E.D.Wis.1983), *In re Marin Motor Oil, Inc.,* 689 F.2d 445 (3d Cir.1982).

Shuman filed his motion for the insurers on August 10, 1981, eight months after the creation of the committee and a month after the order approving the appointment of counsel. He gave notice to Coast and to the United States Trustee, but he concedes that he did not give notice to the committee. Thus, the committee failed to participate in a hearing in which it undoubtedly would have had the right to participate. But I do not think that settles the matter. It is one thing to say that the committee might have been heard had it received timely notice. It would be quite another to say that the committee, not having received timely notice, can go back nearly two years and upset an order that was entered at that time. And this I refuse to do. For the fact is that on this issue, under these circumstances, I think the interests of Coast and the interests of the committee can fairly be regarded as identical. In order to clarify the point, it may be useful to make some general observations about the relation of

the debtor and the creditors' committee in a Chapter 11 case.

Superficially, it would seem that the debtor and the committee are enemies, the creditors trying to get paid and the debtor resisting payment. But on many issues, they are allies. For example, the committee frequently collaborates with the debtor in propounding a plan of arrangement. *See, e.g., In re A.C. Williams Co.,* 25 B.R. 173, 177 (Bkrtcy.N.D.Ohio 1982). The committee and the debtor may be united for the purpose of recovering preferences. *See, e.g., In re Gander Mountain, Inc.,* 29 B.R. 260, 10 B.C.D. (CRR) 605 (Bkrtcy.E.D.Wis. 1983). In these and similar cases, it is in the interest of both the debtor and the committee to maximize the estate. Similarly, on issues such as the adjuster's claim, it is plausible to suppose that the interest of Coast and the committee might well be the same. They certainly appear the same today, as they both resist recognition of this claim as an administrative expense. There is no reason to suppose that their interest would have been any different at the beginning of the case. If a position will be adequately represented by the debtor, I know of no rule requiring also the participation of the committee. *Cf. In re Wesco Products Co.,* 22 B.R. 107 (Bkrtcy.N.D.Ill. 1982). Hence, I find that the exclusion was not prejudicial in this case.

## B

A second reason for rejecting the committee's objection is that the committee simply was not prejudiced by its failure to get notice. The committee had ample opportunity to make its objection to the earlier order at the present hearing. Having heard all that the committee has to say, I think the order was proper in the first place. Ultimately, my point is that the court could have correctly inferred that allowance as an administrative expense might be a benefit to the estate.

As with the issue of the validity, *per se,* of the earlier order, so once again I must

---

**3.** Indeed, the Code seems to mandate the appointment of a committee, although in practice it is sometimes impossible to get people to serve.

concede that this point is not clear-cut. So far as relevant, the Code itself says only that there shall be allowed "the actual, necessary costs and expenses of preserving the estate." Bankruptcy Code § 503(b)(1)(A), 11 U.S.C. § 503(b)(1)(A) (Supp. IV 1981); *cf.* Bankruptcy Code § 503(b)(2), U.S.C. § 503(b)(2) (Supp. IV 1981). Collier takes the position that the language, while not vacuous, yet is not meant to be exclusive. Thus speaking of § 503(b) generally, Collier says:

> While it is true that the court is not free to fashion additional priorities nor to determine among the priorities the order of payment save as Congress provided for such order, it ought not to be assumed that the six designations are necessarily exclusive nor designed to cover every conceivable situation.

3 W. Collier, Collier on Bankruptcy 503–11, ¶ 503.03 (15th ed. 1983).

And so I have a broad, but not unlimited mandate. So instructed, one way of putting the question might be as this: Did the insurers hire the adjuster to benefit *the estate?* Or were the insurers merely seeking to benefit *themselves?* Presumably in the former case, the insurers might be entitled to an administrative expense priority, but not in the latter. *See generally In re O.P.M. Leasing Services, Inc.,* 23 B.R. 104 (Bkrtcy.S.D.N.Y.1982); *compare In re Meyers, Inc.,* 15 B.R. 390 (Bkrtcy.S.D.Cal.1981) *and In re Lee,* 3 B.R. 15 (Bkrtcy.N.D.Ga. 1979) *with In re MCK, Ltd.,* 14 B.R. 518 (Bkrtcy.D.Col.1981). In fact, the parties did address the question this way. But the parties, at least for purposes of advocacy, seem to have locked themselves into extreme positions, neither of which I can accept. Thus, Coast and the committee say that the insurers did only what they were bound to do under a pre-petition contract, benefiting themselves only. The insurers rejoin that they could just as well have done nothing to adjust the claims, asserting the entire claim by way of subrogation. I doubt that either extreme position is correct. The insurer probably was under some sort of global obligation to deal "reasonably" with the claim. *See generally* RE-

STATEMENT (SECOND) OF CONTRACTS) § 205 (obligation of good faith and fair dealing). And not knowing the potential size of the estate, they certainly had practical inducement to reduce the size of the subrogation claim. But I find nothing in the agreement that binds the insurers to adjust the claims in any specific way. Had they been willing to take their chances on the possibility of a solvent estate, they might very well have expended less effort than they did, hoping to shift the entire burden over by way of the subrogation claim.

The difficulty here is that the effort benefited both the insurers and the estate. Indeed, the apportionment of benefit in a case like this is largely a function of the size of the estate. To take some extreme examples: suppose, first, that the debtor files a no-asset bankruptcy. In that event, the insurer will bear all the liability for the claims, with no chance for recompense against the debtor. Correspondingly, the insurer's efforts to reduce claims will reduce the insurer's ultimate liability. On the other hand, suppose that the estate proves to be completely solvent, sufficient to satisfy all creditors' claims, with a surplus to the debtor. In that event, the estate ultimately will pay all the claims. The insurer gets no benefit from the reduction in claims. Rather, every dollar of reduction adds a dollar to the size of the estate. Intermediate between these two, it would be possible to construct examples in which the creditors (including the insurers) enjoyed any gain, while the debtor's position remained stationery.

Against these examples, the record in this case is equivocal. Under the proposed plan, the estate is bound to pay out at least 70 percent of all claims, but only over time and without interest. No one knows for certain yet just what the total of claims will be. Under some assumptions, the adjustment services may constitute a dramatic benefit to the estate; under other assumptions, not so.

But this only addresses the question whether the expenses are *in fact* a benefit to the estate. And this, I think, is not the real point. The point, rather, concerns the *possibility* of benefit. It is this: at the beginning of the case, the parties *might have* assumed that there would have been a benefit. And on such a basis, it might have been an exercise of good business judgment to retain the services of an adjuster.

Case law, such as there may be, is not inconsistent with this approach. The only case any more than remotely relevant is *In re Yellow Cab Company,* 3 B.C.D. (CRR) 843 (S.D.Cal.1977) and 4 B.C.D. (CRR) 289 (S.D.Cal.1978). In *Yellow Cab,* a surety sought recompense for costs in connection with workers' compensation claims. Judge Katz denied the petition insofar as it sought a priority claim for out-of-pocket, post-petition expenses. From the opinions, it is not entirely clear just what sort of costs were at stake. Judge Katz at one point refers to "servicing and administering" the claims, and at another to "adjusting and servicing." On the face of things, it seems conceivable that the surety was seeking recompense for claims paid, and for the administration of the claims process, together in the same proceeding. In any event, there is nothing in either opinion to suggest that the surety played any significant role in reducing the gross amount of claims against the estate. *In re REA Express, Inc.,* 4 B.C.D. (CRR) 1184 (S.D.N.Y.1977) also deals with the surety's right over, but it is not apposite because it deals only with the priority of the surety's subrogation claim.

## IV

So far, I have found that it is proper to pay adjuster's fees as administrative expenses. But this does not end the matter. In fact, there are at least three other issues that need to be disposed of. First, there is the question of the reasonableness of the request. Second, there is the matter of the relationship between this request and the requests of other competing claimants. Third, there is the relationship between this request and subsequent requests from this claimant.

Turning first to the reasonableness of the request, I assume that on this issue I am governed by Bankruptcy Code § 330, 11 U.S.C. § 330 (Supp. IV 1981). That section authorizes payment only of "reasonable compensation for actual necessary services rendered." It says I must take into account "the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title." It may also award "reimbursement for actual, necessary expenses." Coast and the committee previously advised me that if I were disposed to allow this claim, then they wanted an opportunity to address the issue of reasonableness. At my request, they deferred any discussion of that issue pending my disposition of this threshold issue. Since I have decided that the claim is allowable in principle, it will be necessary to address the issue of reasonableness in further proceedings. For the guidance of the parties, however, let me suggest, it seems to me desirable to distinguish between *attorney's* fees and *adjuster's* fees. As I indicated above, the insurer's employed both an attorney and an adjuster in this case (or, rather, two attorneys, one of whom functioned as an adjuster). The insurer's attorney insisted at oral argument that there is a vital distinction between attorneys' services and adjusters' services. I am glad of that distinction, because it seems to me that in this case there is no order, and that it would not be proper to enter an order, for the payment of the insurers' attorney's fees.

A second issue that concerns me is the place of this claim in the context of other administrative expense claims. Confirmation is pending in this case. The parties have asked me to defer the confirmation hearing pending resolution of this issue. From this I infer that the debtor may not be able to confirm his plan if this claim is allowed in full. I assume, of course, that all administrative claimants share equally in funds available for administrative claims. *In re Western Farmers Ass'n,* 13 B.R. 132 (Bkrtcy.W.D.Wash.1981); *cf. In re Callister,*

15 B.R. 521, 524–5 (Bkrtcy.D.Utah 1981). I do not know how I should treat this claim in the context of other administrative claims. This issue, too, is an issue that the parties should address in subsequent proceedings on this matter.

Finally, though it is not before me at this time, I need to know how this claim relates to possible future adjuster's claims. The adjuster has indicated he is not done with his work. This request is thus in effect a request for interim compensation. Bankruptcy Code § 331, 11 U.S.C. § 331 (Supp. IV 1981). Requests for interim compensation may require scrutiny even more strict than what will be required for a final request. *In re UNR Industries, Inc.,* 30 B.R. 613, 10 B.C.D. (CRR) 1020 (Bkrtcy.N.D.Ill. 1983); *In re Mansfield Tire & Rubber Co.,* 19 B.R. 125 (Bkrtcy.N.D.Ohio 1981). Since confirmation may be imminent, I need to know how I should deal with any subsequent administrative expense claim. This, too, is an issue that the parties should address in subsequent proceedings.

To sum up: I find that the prior order in this case is binding and that the insurers are entitled to priority administrative expenses for the costs of adjusting claims, subject to the constraints of Bankruptcy Code § 330, 11 U.S.C. § 330 (Supp. IV 1981) and Bankruptcy Code § 503(a), 11 U.S.C. § 503(a). I do not know the amount of compensation they are entitled to, or whether (or when) it should be paid. I leave these matters to such further proceedings as may be appropriate.

### CLAIMS

| | | Lloyds | Aetna | Total |
|---|---|---|---|---|
| 1. | Total of Claims | 999 | 1,386 | 2,385 |
| 2. | Total Liability | $258,290.78 | $280,352.35 | $538,643.13 |
| 3. | Adjusted | 614 | 1,053 | 1,667 |
| 4. | Original Amount | $153,803.07 | $184,358.26 | $338,161.30 |
| 5. | Reduced Amount | $ 67,146.21 | $ 55,051.03 | $122,197.24 |
| 6. | Percentage (5 ÷ 4) | 43.66 | 29.86 | 36.14 |
| 7. | Remaining (1 – 3) | 385 | 333 | 718 |
| 8. | Remaining (2 – 4) | $104,487.71 | $ 95,994.09 | $200,481.80 |
| 9. | Claim Asserted (5 + 8) | $171,633.92 | $151,045.12 | $322,679.04 |

### ADMINISTRATIVE EXPENSE REQUEST

| | | | |
|---|---|---|---|
| Adjusting | $30,424.50 | $ 35,469.03 | $ 65,893.53 |
| Legal | $13,412.43 | $ 2,096.00 | $ 15,508.43 |
| Total | $43,836.93 | $ 37,565.03 | $ 81,401.96 |