In the Matter of JERMOO'S INCORPORATED, Debtor.

CREDITORS' COMMITTEE FOR JERMOO'S INCORPORATED, Plaintiff,

v.

JERMOO'S INC. and Amoco Oil Company, Defendants.

Adv. No. 83–0181–11.

United States Bankruptcy Court, W.D. Wisconsin.

March 15, 1984.

Patricia M. Gibeault, Brynelson, Herrick, Gehl & Bucaida, Madison, Wis., for plaintiff.

Michael B. Van Sicklen, Foley & Lardner, Madison, Wis., for defendant Jermoo's Inc.

Gregory E. Scallon, Virginia M. Bartelt, Stafford, Rosenbaum, Rieser & Hansen,

Madison, Wis., for defendant Amoco Oil Co.

## OPINION AND ORDER FOR SUMMARY JUDGMENT

ROBERT D. MARTIN, Bankruptcy Judge.

Jermoo's, Inc. operates three retail gasoline stations in Wisconsin under franchise-dealership contracts with Amoco Oil Company, and is also party to a wholesale "jobbership" contract with Amoco. A provision of each of the dealership contracts provides that Amoco, the franchisor, could terminate Jermoo's, Inc. as franchisee if Jermoo's failed to cure dishonored checks within five days of notice. Checks relating to operations of the dealerships were dishonored in January 1983, and on January 27 and 28, 1983, Amoco gave notice of the dishonor to Jermoo's. When Jermoo's failed to cure, Amoco terminated two of the dealerships by letter of February 3, 1983. The terminations were to take effect at the end of ninety days.

The debtor has been in arrears on the jobbership account since September 1981. Although the parties informally agreed that Amoco would not terminate the jobbership in return for Jermoo's selling one of its stations and giving Amoco additional security, the debtor failed to take either action. On February 1, 1983, Amoco terminated the jobbership, but gave Jermoo's fifteen days to cure, as required by the jobbership contract. Debtor has not cured this arrearage.

Jermoo's, Inc. filed its chapter 11 petition on February 4, 1983. In an earlier adversary proceeding[1] this court denied Jermoo's request to assume the two terminated dealership contracts on the principal ground that they were no longer "executory" as of the time the debtor filed its petition on February 4, 1983. Rather, they had been terminated before the filing, with only the passage of time remaining for the termination to become effective. *Moody v. Amoco Oil Company*, 31 B.R. at 218–219. The jobbership contract was also no longer executory as of the time the complaint in the adversary proceeding was filed, because even if the limited extension provisions of 11 U.S.C. § 108(b) were applied, the time for effecting a cure of the default expired sixty days after the filing of the petition. 31 B.R. at 219–220. This court's order in *Moody* was stayed by the district court, Moody's appeal to the district court was dismissed, and an appeal from the district court's order is now pending before the Seventh Circuit. *See*, n. 1 *supra*.

The Creditors' Committee for Jermoo's Inc. ("Committee") was appointed February 14, 1983, and took an informal role in the *Moody v. Amoco Oil Company* proceeding until it formally intervened in support of the debtor-plaintiff on May 18, 1983. Although the Committee's motion to intervene was granted, the record discloses no pleading filed by the Committee. *See* former Bankruptcy Rule 724, incorporating Fed.R.Civ.P. 24.

On July 19, 1983, after this court had decided the prior adversary proceeding, and while the district court's stay was in effect, the Committee filed the present adversary proceeding, seeking to avoid the termination of the contracts as a fraudulent transfer under 11 U.S.C. § 548(a)(2).[2] The debt-

---

1. *Moody v. Amoco Oil Company*, 31 B.R. 216 (Bkrtcy.W.D.Wis.1983), *stay granted* 31 B.R. 224 (W.D.Wis.1983), *appeal dismissed*, order of July 29, 1983 (W.D.Wis.), *appeal pending* before United States Court of Appeals for the Seventh Circuit.

2. 11 U.S.C. § 548(a)(2) provides:

   (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year be-

fore the date of the filing of the petition, if the debtor—

. . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business, or was about to engage in business or a transaction, for which

or, joined as a defendant, filed an answer in which it admits the Committee's principal allegations and understandably "does not dispute" the Committee's entitlement to the relief it seeks. Amoco, the principal defendant, has filed a motion to dismiss or for summary judgment, arguing (1) that the Committee lacks standing to institute an action to avoid an alleged fraudulent transfer, (2) that the Committee's claim is barred by *res judicata*, and, (3)(a) that a prepetition termination of contract rights is not subject to the terms of § 548, and (b) that such a termination is not a "transfer" for purposes of the Bankruptcy Code. The issues stated by Amoco will be considered serially below.

■ 1. *Standing of the Committee.* Under the Code, a creditors' committee in a chapter 11 case, as a "party in interest" "may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). Unless "raise" excludes the usual means of bringing an issue to the attention of the court by motion or complaint, the plain language of the · statute grants "standing" to the Committee to bring this action. It is true that § 1103(c), which sets out the powers and duties of the creditors' and equity security holders' committees, does not expressly authorize the bringing of an action by such a committee,[3] but subparagraph (5) provides general authority to a committee to "perform such other services as are in the interest of those represented." Section 1109, granting "party in interest" status to various entities, including a creditors' com-

mittee, is *in pari materia* and clearly consistent with § 1103(c)(5).

In *In re Monsour Medical Center*, 5 B.R. 715 (Bkrtcy.W.D.Pa.1980), a creditors' committee, relying on § 1109(b), sought to avoid certain transfers as preferences or fraudulent transfers. The debtor-defendant argued that the committee lacked standing because it was not a real party in interest as required by former Bankruptcy Rule 717, which incorporated Fed.R.Civ.P. 17. Other defendants cited the lack of express authority in the Code for a committee to maintain a cause of action in place of the trustee or debtor in possession. The court held that the committee's power to sue had been recognized under the prior Act, and that such power continued under the Code. *Id.* at 718. But, significantly, the *Monsour* court expressly left unresolved the question whether § 1109 "contemplates the initiation of an adversary proceeding by a creditors' committee." *Id.* at 719. Instead, the court grounded its decision on an "implied power to sue" and on the authority of the bankruptcy court to permit such an action when the trustee or debtor in possession breaches its statutory duties. In *Monsour*, the committee was only authorized to bring suit on the debtor's behalf. Under *Monsour*, then, and apart from § 1109(b), an action by the committee must begin with a motion to the court for approval to sue on the debtor's behalf. An objection that the instant case was not brought in the name of the debtor in possession could be easily corrected under Fed.R.Civ.P. 17 incorporated in former

---

any property remaining with the debtor was an unreasonably small capital; or
(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

**3.** 11 U.S.C. § 1103(c) provides:
(c) A committee appointed under section 1102 of this title may—
(1) consult with the trustee or debtor in possession concerning the administration of the case;
(2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the

desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;
(3) participate in the formulation of a plan, advise those represented by such committee of such committee's recommendations as to any plan formulated, and collect and file with the court acceptances of a plan;
(4) request the appointment of a trustee or examiner under section 1104 of this title, if a trustee or examiner, as the case may be, has not previously been appointed under this chapter in the case.
(5) perform such other services as are in the interest of those represented.

Bankruptcy Rule 717 (and present Rule 7017), which provides for a reasonable time for ratification by the debtor or substitution of the real party in interest. Jermoo's answer strongly suggests ratification of the complaint by the debtor in possession, and its pretrial statement expressly seeks an opportunity to ratify.

The cases cited for the proposition that the committee lacks standing, *In re Segarra*, 14 B.R. 870 (Bkrtcy.D.P.R.1981) and *In re Marin Motor Oil, Inc.*, 689 F.2d 445 (3rd Cir.1982) are in fact generally consistent with *Monsour Medical Center.* All these cases hold in effect that the creditors' committee may bring an adversary proceeding, at least upon motion to intervene and in the name of the debtor or debtor in possession.[4] *Cf. In re Joyanna Holitogs, Inc.*, 21 B.R. 323 (Bkrtcy.S.D.N.Y.1982). This court granted the creditors' committee's motion to intervene in the prior adversary proceeding. Although specific authority of the court has not been sought, and the committee's action in the instant adversary proceeding is not expressly brought in the name of the debtor, these deficiencies can readily be corrected under Fed.R.Bankr.P. 7017 (incorporating Fed.R.Civ.P. 17). Thus it is reasonable to conclude that for practical purposes, the creditors' committee has standing to bring this action. The alignment of Jermoo's, Inc. as a defendant in the instant case is not significant. Jermoo's, Inc. could just as easily be a plaintiff in the present case, and the court is free in a proper case to realign the parties according to their true interests.[5]

2. *Res judicata.* Courts and litigants have struggled for centuries with the intricacies of the related doctrines of *res judicata* or "claim preclusion" and collateral estoppel or "issue preclusion." In a recent cogent summary statement, the Supreme Court of the United States distinguished the two doctrines as follows:

Under the doctrine of *res judicata*, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.

*Parklane Hosiery Company, Inc. v. Shore*, 439 U.S. 322, 327, n. 5, 99 S.Ct. 645, 649, n. 5, 58 L.Ed.2d 552 (1979). *Cf. Brown v. Felsen*, 442 U.S. 127, 138, 99 S.Ct. 2205, 2212, 60 L.Ed.2d 767 (1979). The assertion of *res judicata* to bar this proceeding has apparent merit: the complaint in the prior proceeding sought to save the dealership contracts for the debtor. A contention that the terminations were avoidable fraudulent transfers could have been stated and joined with a motion or petition to assume the contracts, despite any apparent contradiction between the two causes of action.[6] Of course, the debtor, plaintiff in the prior adversary proceeding, and the Committee, plaintiff in the present proceeding, are not the same parties. But for purposes of *res judicata*, they are apparently "privies," in that they represent the same interest in the outcome of the litigation. Under the "Schendel doctrine," a judgment adverse to the debtor will bind the committee in this later action if the committee was acting for the same real beneficiary in both proceedings whether the beneficiary is actually the debtor, the creditors or other parties. *Chicago, R.I. & P.R. Co. v. Schendel*, 270 U.S. 611, 620–21, 46 S.Ct. 420, 423–24, 70 L.Ed. 757

---

**4.** "Absent *specific authority conferred by the court*, the Creditors' Committee has no authority to sue...." *Segarra*, 14 B.R. at 878 (emphasis supplied). *Cf. Marin Motor Oil, supra,* which held that a motion to intervene may be unnecessary. 689 F.2d at 451–456.

**5.** *See, generally* 3A Moore's Federal Practice ¶ 19.06, esp. n. 3, and 19–98–19–101. Realign-

ment is familiar in, but not limited to, diversity jurisdiction issues. *See, id.* at ¶ 19.03.

**6.** Former Bankruptcy Rule 708, incorporating all pertinent parts of Fed.R.Civ.P. 8; *see* especially Fed.R.Civ.P. 8(e)(2); *cf.* former Bankruptcy Rule 718, incorporating Fed.R.Civ.P. 18.

(1926). The Committee may only bring an action on behalf of the debtor or debtor in possession which was a party to the prior action. *See* 1. *supra.* There is thus either privity, or substantial identity, between these two parties for purposes of the two adversary proceedings.

■ As debtor in possession, Jermoo's must act for the benefit of unsecured creditors, the same class represented by the Committee. While the Creditors' Committee may in some cases take a position adverse to the debtor or debtor in possession, in the present and prior adversary proceedings the interests of the two coincide. *See* 1B *Moore's Federal Practice,* ¶ 0.411[1] at 394–395 (1983); *id.* ¶ 0.411[3.–2] at 428–429. A nonparty may, by reason of participation in an action, be bound by the conclusive force of a judgment. *See generally id.* ¶ 0.411[6].

■ If the Committee and the debtor were either privies or had the same interests in the litigation, the issue is whether the Committee could have raised the fraudulent transfer issue in the prior action under the facts of this case.

> The present trend is undoubtedly in the direction of requiring that a plaintiff present in one suit all the claims for relief that he may have arising out of the same transaction or occurrence.

1B Moore's Federal Practice ¶ 0.410[1]; *Cf. Expert Electric, Inc. v. Levine,* 554 F.2d 1227, 1234–5 (2nd Cir.1977). By its pretrial order of April 21, 1983 in the prior proceeding, this court limited the hearing to two issues: the issuance of a permanent injunction against the terminations, and whether the debtors could assume the contracts. Some other issues had arguably been raised previously in the proceeding, but these two matters were the sole subjects of the pretrial order which was in effect at the time that the Committee intervened on May 18, 1983. The Committee did not, as is apparently customary, file a proposed

pleading with its application for intervention.[7]

It seems clear that the intervention by the Committee on the side of the debtor in possession without additional pleading amounted to the adoption by the Committee of the complaint by the debtor in possession, Jermoo's, Inc. Had it chosen to do so, the Committee was free not only to file a pleading, but to join in that pleading all the bases for relief available to it, including the present fraudulent transfer claim even though an assertion of fraudulent transfer might be otherwise inconsistent with the debtor's motion to assume the dealership contracts.[8] Multiplication of adversary proceedings in bankruptcy is no more desirable than multiplication of civil actions generally, and the same policy favoring the finality of judicial decisions should apply in adversary proceedings as in any other civil action. Finally, "[t]he effect of a judgment [or order] as *res judicata* between adverse parties is not dependent on the arrangement of the parties in the record." 1B *Moore's Federal Practice* ¶ 0.405[1] at 185. Thus the fact that Jermoo's was a plaintiff in the prior proceeding and a defendant in the present one is legally irrelevant.

■ *Res judicata* precludes a second suit on the same cause of action which was earlier determined. The scope of a "cause of action" is generally bounded by the injury for which relief was claimed. 1B *Moore's Federal Practice* ¶ 0.410[1] at 350. A key question in determining whether one "case" exists is whether the two actions share a "common nucleus of operative fact," *id.* at 361. *Expert Electric, Inc. v. Levine,* 554 F.2d at 1234. *Cf. United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The prior judgment bars not only the grounds actually pleaded, but also "every ground of recovery or defense which might have been presented." 1B *Moore's Federal Practice* ¶ 0.410[2] at 363.

---

7. Former Bankruptcy Rule 724, incorporating Fed.R.Civ.P. 24; *see especially id.* (c).

8. Former Bankruptcy Rule 718, incorporating Fed.R.Civ.P. 18; especially 18(b); former Bankruptcy Rule 708, incorporating Fed.R.Civ.P. 8; especially 8(a).

Since the Committee bound itself to the original complaint of the debtor in possession in the prior adversary proceeding, when it need not have done so, the principles of *res judicata* appear to preclude the Committee's raising this issue in this second adversary proceeding. This is particularly so in the present case, because the Creditors' Committee is bringing a second action on the very same facts as the first action. Since the Committee is in effect suing on behalf of the debtor, it must be viewed as the party which brought the prior action merely introducing a new legal theory. That theory was potentially available to both the debtor in possession and the Committee when the latter moved to intervene. *Res judicata* should ordinarily apply to bar this second action. *See Dannhausen v. First National Bank of Sturgeon Bay*, 538 F.Supp. 551, 567 (E.D.Wis.1982); *Expert Electric, Inc. v. Levine*, 554 F.2d at 1234.

The Committee argues that, in the posture of the case as of the time it intervened, on May 18, 1983, the issues had been narrowed to questions concerning the executory contract, and that therefore it could not have litigated the fraudulent transfer issue. While this contention is not entirely without merit, it must fail. Although the hearing on May 18, 1983 was limited to the two issues agreed to by the parties to the case at a prehearing conference, only the subject matter of the May 18th hearing was limited by the prehearing order. The Committee could have filed its own complaint, broader than the issues to be heard on May 18, and such additional issues as it raised would have been dealt with by the court at an appropriate time, possibly even the May 18th hearing. When a party—including an intervening party—seeks to raise new issues governed by facts identical to those already heard and determined, the suspicion inevitably arises that the new legal theory sought to be applied to old facts is no more than an afterthought.

Under the Emergency Rule in effect in this district during the prior proceeding, appeal from this court was apparently under a *de novo* standard.[9] "Under the federal rule, an appeal that constitutes a proceeding *de novo* vacates the appealed judgment and suspends its operation as *res judicata*" 1B *Moore's Federal Practice* ¶ 0.416[3] at 523. *Refior v. Lansing Drop Forge Co.* 134 F.2d 894 (6th Cir.1943). Under the Bankruptcy Rules presently in effect the "clearly erroneous" standard is to apply on appeal. Fed.R.Bankr.P. 8013.[10] The affirmance by the district court of this court's ruling in the prior proceeding makes it unnecessary to resolve the difficult question whether this matter is to be decided by application of the prior or current standard, since further appeal is no longer *de novo*. That issue may be decided by the Seventh Circuit if at all. Fortunately, it is not essential to rely on the *res judicata* effect to be given to the prior determination, since the complaint filed in the present proceeding must fail, in any event, as a matter of law.

■ 3. *Termination of contract rights as transfer*. Section 101(40) of the Bankruptcy Code defines "transfer:"

'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest

---

**9.** The Emergency Rule, at (e)(2)(B) provides:

(e) District Court Review
....
(2)(B) In conducting review, the district judge may hold a hearing and may receive such evidence as appropriate and may accept, reject, or modify, in whole or in part, the order or judgment of the bankruptcy judge, and need give no deference to the findings of the bankruptcy judge. At the conclusion of the review, the district judge shall enter an appropriate order or judgment.

Order Adopting Rule Regarding Bankruptcy Cases and Proceedings, December 27, 1982, W.D.Wis.

**10.** The new rules are to apply "to proceedings ... pending [on Aug. 1, 1983] except to the extent that ... their application in a pending proceeding would ... work injustice." Order Prescribing Federal Rules of Bankruptcy Procedure, Supreme Court of the United States, April 25, 1983.

in property, including retention of title as a security interest.

In order for the trustee or debtor in possession to avoid a transfer as fraudulent, the debtor must have been insolvent at the time of the transfer, or have been left with an unreasonably small capital. The transfer must have taken place within one year prior to filing the petition in bankruptcy, and the transfer must have brought the debtor less than "reasonably equivalent value." 11 U.S.C. § 548.[11] Assuming for present purposes that the debtor was either insolvent or left with unreasonably small capital, and recognizing that the termination of the dealerships took place on the day before the debtor filed for bankruptcy, it remains to determine whether the termination of an executory contract, according to the terms of the agreement, can be a transfer under the Bankruptcy Code.

▆ The contention that the termination of an executory contract is a fraudulent transfer appears to be a matter of first impression under the Bankruptcy Code, and was almost unknown in reported decisions under the prior Act. It is striking that of all the many decisions reported under the Bankruptcy Code, and the numerous decisions under the eighty year history of the prior Bankruptcy Act, research has disclosed only two reported bankruptcy decisions which reflect the view that the termination of an executory contract is comprehended in the meaning of "transfer"—even though the definition of transfer under the Act was as broad as, or broader than, the definition under the current Code.[12] Since it is reasonable to as-

11. 11 U.S.C. § 548 provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—
(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
(b) The trustee of a partnership debtor may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, to a general partner in the debtor, if the debtor was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.
(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on any interest transferred, may retain any lien transferred, or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.
(d)(1) For the purposes of this section, a transfer is made when such transfer becomes so far perfected that a bona fide purchaser from the debtor against whom such transfer could have been perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer occurs immediately before the date of the filing of the petition.
(2) In this section—
(A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor; and
(B) a commodity broker or forward contract merchant that receives a margin payment, as defined in section 761(15) of this title, takes for value.

12. Former 11 U.S.C. § 1(30) defined "transfer" to "include the sale and every other different mode, direct or indirect, of disposing of or parting with property or with an interest therein with the possession thereof . . . as a conveyance, sale, assignment, payment, pledge, mortgage, lien, encumbrance, gift, security or otherwise. . . ."

sume that a great many executory contracts were terminated against insolvent debtors prior to bankruptcy filings, the nearly total silence of the courts strongly suggests a continuing practical construction of the fraudulent transfer statute by the bench and bar which excludes from the statute rightful terminations of operating agreements.[13]

This court recently reviewed the construction of the fraudulent transfer section of the Code. In *Berge v. Sweet*, 33 B.R. 642 (Bkrtcy.W.D.Wis.1983), a strict foreclosure of a Wisconsin land contract was held avoidable as a fraudulent transfer. The property in question had a fair market value shortly before foreclosure of more than $2.5 million. The property could have been redeemed on payment of about $1.75 million. Thus there was not reasonably equivalent value exchanged; the debtors were insolvent, and the transfer took place only one day before the bankruptcy filing. There was a "transfer" for § 548 purposes since property rights of the debtors were taken away from them by the foreclosure. The court relied on Wisconsin law defining the purchasers of real estate on land contract as equitable owners, while the vendors retained bare legal title as security for the payment of the purchase price. *Id.* at 647–648 [citing *Kallenbach v. Lake Publications, Inc.*, 30 Wis.2d 647, 142 N.W.2d 212 (1966); *In re Foreclosure of Tax Liens*, 106 Wis.2d 244, 250, 316 N.W.2d 362 (1982)]. Thus a transfer occurred because an ownership interest was "parted with" by the debtors.

Although it is now clear that the meaning of "property rights" is considerably broader than ownership of tangible objects or real estate, it is also clear that not all rights are property. *See e.g. Board of Regents v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). When property, real, tangible, or intangible, is

transferred, the property itself is not transformed by the exchange. The termination of the right to perform on an executory contract, according to the terms of that contract, differs from a transfer of property in this sense: the rights terminated, unlike property, are transformed. At the option of the terminating party, the rights may simply disappear, or as with other kinds of property, may be dispersed, reconveyed or retained.[14]

The structure of the Bankruptcy Code reflects this understanding of the difference between the loss of rights under an executory contract and other transfers of property. A separate section (11 U.S.C. § 365) governs the treatment of executory contracts. It would be anomalous, to say the least, to expect that the drafters of a generally thrifty codification of bankruptcy law would devote a substantial section of the Code to the subject of the assumption or rejection of executory contracts and unexpired leases, while at the same time allowing a portion of that subject to spill over into the section governing fraudulent transfers and obligations. There is no indication in the language of § 365, § 548, or the legislative history of the Code, that the drafters had such an unlikely intention. Nor has any court, so far as we are informed, so concluded since the adoption of the Bankruptcy Code. A statute should be construed as a harmonious whole. 73 Am. Jur.2d, *Statutes*, § 191 (1974). This is even truer of a Code. The general language of § 548 must be read harmoniously with the rest of the Code, including § 365 (and § 108) in order to give effect to the legislative intent. *Id.* § 199. *Cf. In re Santa Clara Circuits West, Inc.*, 27 B.R. 680, 683 (Bkrtcy.D.Utah 1982) (§ 362 and § 366 must be construed so as to avoid contradiction, citing general rule of construction of statutes).

---

13. *But see, In re Quaker Room*, 90 F.Supp. 758 (S.D.Cal.1950) and *Landy v. Silverman*, 189 F.2d 80 (1st Cir.1951) (liquor license may be property subject to fraudulent "transfer").

14. *See, e.g. Schokbeton Industries, Inc. v. Schokbeton Products Corp.*, 466 F.2d 171 (5th Cir.1972) (while some intangible property rights are subject to possession, the debtor's rights under an exclusive licensing agreement "evaporated" upon notice of termination.)

Only two published federal court decisions have apparently considered an assertion that the termination of an executory contract according to its own terms was a fraudulent transfer. Neither of these Bankruptcy Act cases provide any extended analysis of the relationship between contract termination and transfer. In *Darby v. Atkinson (In re Ferris)*, 415 F.Supp. 33 (W.D.Okl.1976) a lessor of certain property appealed an order of the bankruptcy court invalidating his termination of a lease held by the bankrupts. The bankrupts had leased property for a long term, and constructed theaters and restaurants on the property. After some years of successful operation, they fell into arrears on their rental payments, and were given notice of default, and of termination if default were not cured. Involuntary bankruptcy petitions were filed against the debtor enterprise and the individual debtors within a short time after notice of termination. Following the termination and the bankruptcy petitions, the lessor re-leased the property to another party for a substantial profit. The bankruptcy court set aside the termination of the lease on three grounds, one of which was that the termination constituted a fraudulent transfer under the provisions of then 11 U.S.C. § 107(d)(2), predecessor to 11 U.S.C. § 548. Although the district court found that the termination was proper under state law, it did hold that the lease termination was a fraudulent transfer under the Bankruptcy Act. It is probably significant that in finding that the termination of a lease was included within the meaning of transfer, the court recited the definition of "transfer" under the Code at then 11 U.S.C. § 1(30), which provided that " '[t]ransfer' shall include the sale and every other and different mode, direct or indirect, of disposing of or parting with property or with an interest therein or *with the possession thereof* or of fixing a lien upon property [etc.]" (emphasis supplied). By comparison, under the Code the words "parting ... with the possession thereof"

have been deleted.[15] In any event, *Ferris* is the only case cited to this court, or of which the court is otherwise aware, holding that the termination of a contract or lease may be avoided as a fraudulent transfer. The contention by defendant Amoco Oil Company that *Ferris* is anomalous appears justified.

The second published federal court decision is both more nearly apposite and controlling precedent for the present case. In *Allan v. Archer-Daniels-Midland Co., (In re Commodity Merchants, Inc.)*, 538 F.2d 1260 (7th Cir.1976) the trustee sought to assume Commodity's contracts under § 70(b) of the Act. The commodities futures contracts in question had been breached by the bankrupt, and the contracts terminated pursuant to a contractual provision allowing Archer-Daniels-Midland to terminate if the bankrupt's financial position became unsatisfactory. The termination occurred ten days before the debtor was adjudicated bankrupt. The bankruptcy court held that the contracts had been terminated in good faith, and were no longer executory at the time of the bankrupt's filing, and thus the trustee could not assume the contracts. The district court and the Seventh Circuit affirmed. The Seventh Circuit reasoned that there was no transfer of the bankrupt's property when Archer-Daniels-Midland cancelled the four contracts. "The essence of a transfer is the relinquishment of a valuable property right.... ADM did not reacquire any rights from [bankrupt] upon cancellation, for ADM had reserved the option of terminating the contracts if [bankrupt's] financial condition deteriorated." 538 F.2d at 1263. Interestingly, the court suggested in *dicta* that if the contracts had been freely transferable, the cancellation might have deprived the bankrupt of its property right to resell the contracts. But under the terms of the agreement between the parties, the contract rights could not be assigned without the written consent of

---

**15.** I thus must differ with 2 *Collier on Bankruptcy* ¶ 101.41 at 101–81–82, which states that the meaning of transfer is "equally as broad" under the Code under the prior Act (with certain immaterial exceptions).

ADM, and such consent was neither sought nor received. Certainly the contracts terminated by Amoco in this case were not freely transferable by the debtor. In fact they were more nearly similar to a personal service contract than to the commodities contract considered in *Commodity Merchants.*

A respected authority on the closely related state law of fraudulent conveyances maintains that creditors "can attack the fraudulent conveyance of every asset, tangible or intangible." 1 Glenn, Fraudulent Conveyances and Preferences, § 138 (1941). But the same author notes that for an asset to be available to creditors, it must be transferable, i.e. it must be something the debtor can give or sell. *Id.* at § 139. Clearly, some rights under contracts are freely alienable, and such rights, along with more tangible property, may be the subjects of a fraudulent transfer. A privilege to operate under a franchise is not such a right. Because of the structure of the Code, which governs executory contracts elsewhere to the exclusion of § 548, and because of the particular nature of the contract and of franchises under state and federal law, the termination in this case cannot be deemed the subject of a fraudulent transfer.

Under the franchise agreement, the lessee, Jermoo's, is prevented from assigning its lease without Amoco's written consent. Dealership Lease ¶ 14(a). Although Amoco may not unreasonably withhold its consent [¶ 14(b)], the measure of reasonableness will turn on various factors, including applicable law. Both the Wisconsin Fair Dealership Law, WIS.STATS. ch. 135, and the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801 *et seq.*, which partly supersedes the Wisconsin law, sharply limit the right of a franchisor to terminate its franchisee.[16] Reason and fairness suggest that if a party's right to terminate an existing arrangement is restricted, that party must be given proportionately greater scope in its initial choice of parties with which it will contract. In brief, Amoco has a freedom to approve or disapprove a proposed assignee of a dealership franchise commensurate with its obligations once a franchise agreement is entered into.[17] It would be folly to construe ¶ 14, therefore, as rendering operating rights under the franchise freely assignable. In fact, Jermoo's would have to cancel its lease before Amoco would agree to a *de facto* assignment, ¶ 14(b). That same subparagraph purports to prevent any encumbrance or levy on the leasehold without Amoco's consent. In light of the severe restriction of alienability of the operating rights, the contract lacks the element of transferability referred to as a prerequisite in *Commodity Merchants.*

The purpose of fraudulent transfer law from its inception under the statute of Elizabeth [13 Eliz. I, ch. 5 (1570)] to the present, has been to prevent loss to creditors upon execution of a judgment. While real property and tangible personal property can be reached by judgment creditors upon execution—WIS.STAT. § 815.05—executions upon some kinds of intangible personal property are difficult to envision. Execution may be made upon a debtor's earnings, for example, through garnishment. Execution could be made, in an appropriate case, upon payments due to Jermoo's under its franchise. But it is hard to imagine execution upon a debtor's right to continue in business under a dealership contract. Since no creditor could readily seize a franchisee's right to continue operation in general, *a fortiori* it could not be done when such a right has been terminated according to the terms of the agreement which creates it.

I therefore conclude that this proceeding may be barred by the doctrine of *res judicata,* or if it is not so barred, the complaint

---

**16.** *See, e.g.,* WIS.STATS. § 135.03, .04, and 15 U.S.C. § 2802.

**17.** Although the assignment could be on a trial basis, 15 U.S.C. § 2803; Lease ¶ 14(b), consider-ations of practicality suggest that a trial lessee would be subject to similar qualifications to those expected of a regular franchisee.

must fail on its merits. Summary judgment must be granted to Amoco.

Upon the foregoing opinion which shall constitute my findings of fact and conclusions of law in this proceeding, it is hereby

ORDERED that defendant Amoco Oil Company may have summary judgment dismissing the complaint of the plaintiff in this adversary proceeding.