WESTERN UNION TELEGRAPH COMPANY *v.* BUSH.

4-4187

Opinion delivered December 23, 1935.

1086

W. R. Donham and Rose, Hemingway, Cantrell & Loughborough, for petitioner.

Malcolm T. Garner, A. G. Meehan, Jno. W. Moncrief, J. H. Lookadoo and Sam T. & Tom Poe, for respondent.

BAKER, J.  C. J. Singleton and Frank Lester filed separate suits in the circuit court of Clark County to recover damages for alleged loss of crops of corn and cotton growing on certain lands in Pulaski County, Arkansas.  Singleton was the owner of land and Lester was a tenant.  It was charged in the complaints, in each case, that the defendant, Western Union Telegraph Company, cut a certain levee nearly or about a mile west of the lands owned and cultivated by the parties suing it, by digging a hole down into the levee and inserting therein a pole for the suspension of its lines, and that this placing of the pole in said levee caused the levee to break by weakening or destroying its resistance to the pressure of the flood waters caused by rain occurring on July 4th and 5th, 1932.  The pole was put into the levee some time in April prior to the date of the break in the levee.

For a more elaborate or detailed statement in relation to the facts, reference is made to the case of *Western Union Telegraph Company* v. *Turner*, 190 Ark. 97.  The case just mentioned grew out of the same alleged act of negligence on the part of the defendant, the same break in the levee and the injuries complained of are damages to crops on lands either near or adjacent to lands occupied and cultivated by the plaintiffs, Singleton and

Lester, who filed their suits in the circuit court of Clark County.

The question that arises upon this petition for a writ of prohibition is the question of venue raised in the circuit court by motion to quash the service of summons. Motion being overruled, the defendant, Western Union Telegraph Company, upon being required to answer, filed the petition here under consideration. The petitioner asserts that the cause of action of these parties is a local action, the venue of which must be in Pulaski County, where the lands are situated, and that, for the destruction of the growing crops, as sued for, the action cannot be transitory. The respondent ruled adversely to this petitioner, and now defends this proceeding, upon the theory that the growing crops were chattels, and that the action is therefore transitory.

The petitioner relies primarily upon § 1164 of Crawford & Moses' Digest, which is § 84 of the Civil Code. It reads as follows:

"Actions for the following causes must be brought in the county in which the subject of the action, or some part thereof, is situated:

"First. For the recovery of real property, or of an estate or interest therein.

"Second. For the partition of real property.

"Third. For the sale of real property under a mortgage, lien or other incumbrance or charge.

"Fourth. For an injury to real property."

Counsel for respondent, with more than extraordinary diligence, energy and powers of research, have furnished us with an elaborate array of authorities, either directly in point upon this vexing question or by analogy, pointing to the conclusions that they have drawn.

They call our attention to several legislative enactments of our State relating to crops, which statutes furnish, at least, a somewhat plausible ground upon which argument may be based to support the conclusions they would have us reach. One of these is a statute making legal mortgages upon crops. The ordinary crop mortgage, under this statute, c. 125, Crawford & Moses' Digest, is not different from the ordinary chattel mort-

gage, nor is the registration by filing different. This statute, however, though it may treat crops as chattels, does not expressly declare them to be such, but they may be so regarded when mortgaged without impairing any of the well-known tests as to certain attributes of real estate. The mortgage on a crop may be treated as a constructive severance. Any sale of a growing crop, not in contravention of the statute of frauds, would amount to constructive severance.

We think there could be little difference of opinion about severance of products from the soil, and that after severance they become movables and are therefore chattels, but it is equally true that there may be a constructive severance by which articles may thereby become chattels as one might sell or transfer a house, with the privilege or right of removal. The sale of fruit upon the trees by contract of the parties would be a constructive severance, and what had been prior to the contract a part of the realty would become chattels in legal effect. *Cannon* v. *Matthews,* 75 Ark. 366, 87 S. W. 428, 69 L. R. A. 827, 112 Am. St. Rep. 64.

We are cognizant of the arguments in the opinion in the cited case, but since the case arose out of the sale of strawberry plants, we suggest that perhaps the respondent has minimized the effect of the consequent constructive severance. The writer of this opinion was following the same theory as the respondent in the case of *Lee* v. *Bandimere,* 140 Ark. 277, 215 S. W. 635. There were two of these cases wherein Bandimere was plaintiff against Lee as defendant, in the first of which Bandimere sued in replevin for the crops. His second suit was a suit in ejectment. Bandimere got possession of the crops under his replevin suit, but this suit was dismissed for lack of jurisdiction, and the court was deemed to be without power to order a return of the severed crops. Bandimere won his ejectment suit and claimed the crops as a part of the real estate recovered by him. Lee claimed no right of possession to Bandimere's land. Bandimere was a resident of Colorado, and, during the interval of three or four years, had no one in charge of or looking after his property. During this interval Lee entered and

lived upon it without right, planted and grew the crop in controversy in 1916. There was no constructive severance here as between Lee and Bandimere by mortgage or other kind of agreement, though Lee had mortgaged the crops to Hamilton. Lee secured the dismissal of the replevin suit, and, because of the fact there was no order for the return of the property, appealed to the Supreme Court. This fact appears on page 280 of the cited case. The dismissal was by a *per curiam* order, and is noted in 135 Ark. 617, 204 S. W. 307. Hamilton was unable to enforce his mortgage against Bandimere.

Blackstone, in his first paragraph of chapter 2, Book II, says: "The objects of dominion or property are things, as contradistinguished from persons; and things are by the law of England distributed into two kinds; things real and things personal. Things real are such as are permanent, fixed and immovable, which cannot be carried out of their place; as lands and tenements; things personal are goods, money, and all other movables; which may attend the owner's person wherever he thinks proper to go." Vol. 1, Lewis' Blackstone, 481.

Again it is interesting to note in chapter 25, Book II, Blackstone, 389, in a definition of "things personal" and an illustration thereof by the author, we find this expression: "(3) Such may be all inanimate things, as goods, plate, money, jewels, implements of war, garments, and the like; such also may be all vegetable productions, as the fruit or other parts of a plant, when severed from the body of it, or the whole plant itself, when severed from the ground." Vol. 1, Lewis' Blackstone, 848.

In our attempt at a solution of this problem, we will not be able to analyze and discuss all of the citations presented to us, and most naturally we forego a discussion of those of other jurisdictions, particularly, on account of the fact, that we believe a proper presentation and understanding of our own decisions will work a satisfactory settlement and determination of the controversy.

From a reading of the excellent brief furnished us we believe that counsel for respondent have suffered themselves to be led into error from an unsound or false

theory that a trespass *quare clausum fregit* must necessarily be accompanied by some degree of force as they have argued in one case of proposition of cattle breaking an enclosure.

It is argued also that the telephone pole, inserted in the levee, which, it is alleged caused the break, was more than a mile distant from the lands where the crops were growing, which crops are the subjects of these suits; that, therefore, there was no "breaking of the close." That conclusion however does not necessarily follow. However we shall not enter upon a technical discussion of all the various matters constituting wrongs wherein the remedy was found in the old form of trespass *quare clausum.*

Although all those forms of actions and suits formerly existing were abolished by our Code, (§ 1030, Crawford & Moses' Digest), it is sometimes necessary, or at least somewhat more convenient, to recognize some of these ancient forms, in order that a better understanding may be had of the remedy as it then existed for an alleged wrong, and of the remedy now for the same wrong. We think it is not necessary that the wrongdoer must have been personally present or even present by some person as an agent at the point or place of actual injury. It is sufficient if the wrongdoer actually set in motion some dangerous agency which in itself, though far distant from the wrongdoer, inflicts a wrong, such as a "breaking of the close," and for such trespass relief is granted.

Any other theory would absolve the guilty and permit the wrongdoer to escape only by reason of shrewdness, rather than by the presentation of a defense.

Without unduly extending this opinion by furnishing examples, the writer would suggest that a remarkable one may be found in the 15th chapter of the Book of Judges.

We have been impressed in this case with the remarkable ingenuity of the several attorneys to present decisions of our own court in a light most favorable as supporting their respective theories or beliefs in this action. Both parties to this litigation have presented and argued the case of *Emerson* v. *Turner,* 95 Ark. 597,

130 S. W. 538. We find no particular difficulty in this case and fail to see why learned counsel should differ or disagree about the effect thereof. For some private wrongs a plaintiff may have the election of two or more remedies. If Emerson cut Turner's timber, had it done, or permitted it to be done, beyond question Turner might have taken the timber wherever he could have found it, and this is true notwithstanding the fact that Emerson might have increased its value by labor he had spent upon it, or Turner might have sued Emerson for a conversion of the timber at the increased value at any point or place where Emerson may have been served with process, and he may likewise have sued Emerson's purchaser as a conversioner. Moreover, he may have sued for damage to the real property, charging Emerson as a trespasser for his wrongful entry, upon his lands and the consequent damages. Had he sued for damages to the real property, the venue was local or at the place of the invasion.

In the last cited case the court makes clear this distinction by citing the case of *Jacks* v. *Moore,* 33 Ark. 31. In that case it was charged that the defendant entered upon the land, cut the timber growing thereon and otherwise injured the same, that is the land. Turner sued Emerson however for converted timber. Turner alleged that Emerson had converted timber that belonged to him. The timber cut, as distinguished from trees growing was the subject of conversion as any other personal or chattel property might be. Turner lost his suit by reason of the fact he was unable to prove his case, and not on account of the venue.

In the case of *Short* v. *Kennedy,* 183 Ark. 310, 35 S. W. (2d) 591, plaintiff sued the defendant for 3,234 feet of pine logs converted by the defendant. Certainly one may sue for the conversion of pine logs. It is also true that one could enter upon the land of another and cut the timber thereon. It seems to us that the owner of this timber would have his right or election to sue for damage to the real estate, or for the conversion of whatever timber was taken away. Certainly, if he sued for damage to the real estate, he must sue in the county in which it was located and in the proper court. If he sued for a

conversion of the timber, his suit could be filed and maintained as other transitory cause of action. That is the distinction made in the case of *Jacks* v. *Moore, supra,* and *Emerson* v. *Turner, supra.*

It does not follow that, because articles may be severed from the soil, the action therefor must be one for damages to real property, nor does it follow that, because severed articles may be converted, a suit for conversion is the only remedy.

In order that we may not extend this opinion to an unwarranted length, a further discussion of authorities submitted by the respondent will be omitted, although they have been examined and considered.

Again we refer to Book III, chapter 12, Blackstone Comm. 209, 2 Lewis' Blackstone 1195: ''Every unwarrantable entry on another's soil the law entitles a trespass by breaking his close; the words of the writ of trespass commanding the defendant to show cause *quare clausum querentis fregit.* For every man's land is, in the eye of the law, enclosed and set apart from his neighbor's; and that either by a visible and material fence, as one field is divided from another by a hedge, or by an ideal, invisible boundary, existing only in the contemplation of law, as when one man's land adjoins to another's in the same field. And every such entry or breach of a man's close carries necessarily along with it some damage or other; for, if no other special loss can be assigned, yet still the words of the writ itself specify one general damage, viz: the treading down and bruising his herbage.

''One must have a property (either absolute or temporary) in the soil, and actual possession by entry, to be able to maintain an action of trespass; or, at least, it is requisite that the party have a lease and possession of the vesture and herbage of the land.''

The notes on page 1195, above cited are rather illuminating. One is to the effect that it matters not that there was no actual force, for the law implies force, and damage likewise, in every unauthorized entry. It cites the case of *Norvell* v. *Gray's Lessee,* 1 Swan 96, 103; (Tenn. 1851).

It is also held that the action is founded on possession and not title. Such is the effect of some of the notes on page 1195 just cited.

We further refer to this most eminent authority on the question of venue. Book III, Blackstone, Comm., 294, 2 Lewis' Blackstone, 1265: "In local actions, where possession of land is to be recovered, or damages for an actual trespass, or for waste, etc., affecting land, the plaintiff must lay his declaration or declare his injury to have happened in the very county and place that it really did happen; but in transitory actions, for injuries that might have happened anywhere, as debt, detinue, slander, and the like, the plaintiff may declare in what county he pleases, and then the trial must be had in that county in which the declaration is laid. Though if the defendant will make affidavit that the cause of action, if any, arose not in that but in another county, the court will direct a change of the venue or visne, (that is, the vicinia or neighborhood in which the injury is declared to be done) and will oblige the plaintiff to declare in the other county; unless he will undertake to give material evidence in the first. For the statutes 6 Ric. II, c. 2, and 4 Hen. IV, c. 18, having ordered all writs to be laid in their proper counties, this, as the judges conceived, empowered them to change the venue, if required, and not to insist rigidly on abating the writ; which practice began in the reign of James the First."

There can be little question about the ancient law. We have not changed our venue statute. It is the same now as it was when we adopted the Code. It was declaratory then and now of the common law of venue.

It is unsafe, as well as unsound, to make this venue statute of no effect by new definitions or new interpretations of objects or subjects upon which it may operate.

It must be conceded, in fact the complaints show, that at the time the injury was suffered crops of corn and cotton were in an immature stage. None of them could have been severed from the soil and been of any value. Therefore they were not subject to conversion.

Again turning to the question as to whether a growing crop is real estate or personal property, we find, of

course, opinions which seem to make the point a controversial one. We, however, are of the opinion that this happens by reason of conclusions drawn from announcements made by the courts upon the relation of particular facts. Tiedeman on Real Property, fourth edition, pages 2 and 3, § 2, calls attention to the fact that a grant of lands without qualification conveys not only the soil but everything else which is attached to it, or which constitutes a part of it, the buildings, mines, trees, growing crops, etc. He also adheres rather strictly to the Blackstone definition of real property, one of the essential characteristics being its immobility as distinguished from personal property, which may be carried around upon the person of the owner.

We find also from the same authority, § 7, page 7, that if growing crops are planted by owner of the soil, they form a part of the realty, but if they are planted by a tenant, holding under the owner, then they are personalty as regards the owner of the soil during the continuance of the tenancy, but real estate in respect to all other persons.

We would be somewhat presumptuous to attempt a categorical definition of the proper status of crops as chattels or realty, fitting upon all occasions or circumstances that might or could arise. The textbook writers have not succeeded in doing so, nor have the courts been uniform in their declarations under the same or given conditions. However, our views are in accord with the suggestion of Mr. Tiedeman above referred to, and we think our court has, with practical uniformity, followed the definitions and declarations of the foregoing texts.

We think we have shown from the foregoing citations that our Civil Code in this matter of venue is a restatement of the common-law rule as to actions for trespass. *Jacks* v. *Moore, supra; Cox* v. *Railway Co.,* 55 Ark. 454, 18 S. W. 630.

Where the injury can occur only in one place, or in a particular county, the suit must be brought in that county. *Pike* v. *Little,* 6 Ark. 212.

We have followed the ancient doctrine in regard to conveyances without reservations. Such conveyances

carry the growing crops as a part of the realty. *Gibbons v. Dillingham,* 10 Ark. 9; *Floyd v. Ricks,* 14 Ark. 286; *Gailey v. Ricketts,* 123 Ark. 18, 184 S. W. 422; *Arnold v. Grigsby,* 158 Ark. 232, 249 S. W. 584.

In this case there is no dispute about the condition of the crops at the time of the injury. As a matter of law, however, we take notice that at the particular time and season the crops were unmatured. This is supported by authority. *Graham v. Roark,* 23 Ark. 19; *Tomlinson v. Greenfield,* 31 Ark. 557; *Haffke v. Hempstead Bank & Trust Co.,* 165 Ark. 158, 263 S. W. 395.

We also have authority to the effect that generally replevin will not lie for growing crops, notwithstanding the case of *Cannon v. Matthews, supra.* However, it may be emphasized, in the above case, in addition to the constructive severance of the strawberry plants, that these plants were grown for the purpose of sale as such, and at the time of the institution and maintenance of this suit they were matured for the market and ready for removal. *Jarrett v. McDaniel,* 32 Ark. 598; *Lee v. Bandimere,* 140 Ark. 277, 215 S. W. 635.

It is also held in the last-cited case, in accordance with the ancient doctrine heretofore discussed, that, until the matured crops are severed, whether actually or constructively, they remain a part of the real property. A principle of law recognized by the entire bar is to the effect that the crops of the insolvent mortgagor, whose land, as distinguished from crops, is of insufficient value to pay the mortgage debt, may suffer seizure of his crops by a receiver appointed under the mortgage in foreclosure proceedings. *Osburn v. Lindley,* 163 Ark. 260, 259 S. W. 729; *Bank of Weiner v. Jonesboro Trust Co.,* 168 Ark. 859, 271 S. W. 952; *Wilkening v. Layne-Arkansas Company,* 179 Ark. 667, 17 S. W. (2d) 879.

The superiority of such real estate mortgage over the so-called crop mortgage to another or independent party adds emphasis to the suggestion that the crop is a part of the real property, and is so regarded, although the statute authorizes and makes valid a mortgage upon the crop as distinguished from the real estate as such.

*O'Connell* v. *St. Louis Joint Stock Land Bank,* 170 Ark. 778, 281 S. W. 385.

We think that one of the most recent cases in point is *Missouri Pacific Railway Co.* v. *Henry,* 188 Ark. 530, 66 S. W. (2d) 636. In that case cottonseed had been planted and mixed with the soil, of course, in the planting. On account of flood water, wrongfully cast upon the field, the seed did not germinate. In the suit for damages this court regarded the planted seed as part of the real property.

Aside from the technical proposition of whether we would consider, under all conditions and circumstances, growing crops as a part of the real property or chattels, we think the action for damage to growing crops or crops before severance must necessarily be treated as a trespass *quare clausum,* and that therefore the action is local, not transitory.

The circuit court was in error in attempting to exercise jurisdiction. The remedy for the unwarranted assumption of jurisdiction is prohibition. *Merchants & Planters Bank* v. *Hammock,* 178 Ark. 746, 12 S. W. (2d) 421; *Order of Ry. Conductors of America* v. *Bandy,* 177 Ark. 694, 8 S. W. (2d) 448.

Writ of prohibition will issue.

HUMPHREYS, J., dissents.