**In the Matter of Marvin GORDEN, Debtor.**

**Richard FRUIN and Mary Ann Fruin, Plaintiffs,**

**v.**

**Marvin GORDEN and Production Credit Association, Defendants.**

**Adv. No. 83–0167.**

United States Bankruptcy Court, W.D. Wisconsin.

March 8, 1985.

Michael J. Colgan, Bosshard, Sundet & Assoc., La Crosse, Wis., for plaintiffs.

Michael J. McAlpine, Gleiss, Goodman, Osborne & McAlpine, Sparta, Wis., for defendant PCA.

Galen Pittman, La Crosse, Wis., and William Chatterton, Madison, Wis., for defendant Marvin Gorden.

## OPINION

ROBERT D. MARTIN, Bankruptcy Judge.

On April 1, 1981 Richard and Mary Ann Fruin (the "Fruins") entered into a lease with Marvin Gorden ("Gorden") of certain farmland consisting of 115 acres and described as; Sections 2, 10, and 11, in Township 12 North, Range 4 West, in the Town of Viroqua, Vernon County, Wisconsin ("Vernon County Property"). The lease was to expire on March 31, 1983, but the Fruins served an eviction notice upon Gorden in December 1982 for Gorden's failure to pay rent due under the lease for November 1, 1982.

On October 13, 1982 Gorden had entered into a security agreement with Production Credit Association ("PCA") granting PCA a security interest in crops including those growing on "Sections 3-2-11 Township 12N Range 4W in Vernon County Wisconsin." On January 6, 1983 Gorden corrected the mistake in the security agreement by granting a lien to PCA on the 1982 crops grown in section 10 ("section 10"). The Fruins' land in section 10 was approximately thirty-one acres, twenty-six acres of which Gorden planted in corn.

On January 21, 1983, pursuant to the December eviction notice the Vernon County Circuit Court entered an order *nunc pro tunc* to January 6, 1983, restricting Gorden from picking corn on section 10 until Gorden paid rent in the amount of $3,010.00 due to the Fruins. In addition the order provided that if Gorden failed to pay $3,010.00 to the Fruins before February 6, 1983, the Fruins would be authorized to take judgment against Gorden for that amount and would be restored to possession of their land.

Gorden filed for bankruptcy under chapter 11 on February 4, 1983. On May 5, 1983 this court ruled that the lease between Gorden and the Fruins had expired prior to filing in bankruptcy and that therefore the Fruins were entitled to possession of the Vernon County Property.

On April 21 and 25, 1983, Gorden harvested approximately fourteen acres of corn from section 10 yielding 1,435 bushels of corn. Gorden sold the harvested corn for $2.90 per bushel. The total value of the corn removed was $4,161.50, the cost for removing the corn was approximately $700.00, making the net value of the corn removed approximately $3,461.50. The balance of the corn was harvested by the Fruins.

The initial issue to be determined is whether the standing corn is affixed to the realty and therefore belongs to the Fruins or is personalty which belongs to Gorden. If the encumbered corn is personalty Gorden's interest in it continued after the term of the lease. If instead, the corn is realty the Fruins retained rights in it after the lease terminated. *American Jurisprudence* explains,

One very important question which recurs in many phases of the law of crops involves the nature of crops as realty or personalty. The answer to that question depends upon the circumstances of the particular case, including the character of the crops and whether or not they have been severed from the land, the relation and intention of the parties, and the nature of the transaction in which the question arises, many courts considering them realty in some transactions and personalty in others. The result, of course, is a situation which defies a positive and comprehensive statement as to whether growing crops are realty or personalty, and in which it would be presumptuous to attempt to make a categorical statement that would answer such question definitely for every occasion and under all circumstances in which it may arise.

21A Am.Jur.2d *Crops* § 3 (1981) (footnotes omitted).

There are three major approaches to the question. Some courts follow the doctrine of emblements. Emblements are literally defined as "[t]he crops or products of the land legally belonging to a tenant," *American Heritage Dictionary* 447 (2d ed. 1982). The court in *Sparrow v. Pond,* 49 Minn. 412, 52 N.W. 36 (1892), explained

> At common law those products of the earth which are annual, and are raised by yearly manurance and labor, and essentially owe their annual existence to the cultivation of man, termed 'emblements' and sometimes *'fructus industriales',* were, even while still annexed to the soil, treated as chattels, with the usual incidents thereof as to seizure on attachment during the owner's life, and transmission after his death.... This classification is, of course, more or less arbitrary, but it is the one uniformly adopted by the courts....

52 N.W. at 36–37. The court went on to find that the subject blackberries were not emblements but rather *fructus naturales,* which are considered as realty. In *Voight v. Kanne,* 10 F.2d 747 (C.A. 8th Cir.1926),

the court, considering whether a bankrupt was entitled to exempt crops growing on the homestead under the state homestead exemption statute, explained, "[t]here is some conflict in the different jurisdictions as to whether such crops, while unsevered, are personalty or realty, but the great weight of authority is that unsevered crops are personalty. This was the common law rule and it has been followed in most of the American jurisdictions." 10 F.2d at 748 (cites omitted). The court held that the crops were not exempt under the statute.

■ The doctrine of emblements as applied to the rights of landlord and tenant after expiration of a lease, distinguishes between "away-going" crops and mature crops. Away going crops are those crops which mature after termination of a lease. 21A Am.Jur.2d *Crops* § 24. Courts following the doctrine of emblements usually hold that the tenant is not entitled to away-going crops because the tenant could have chosen not to sow the field. *Peterson v. Vak,* 160 Neb. 450, 70 N.W.2d 436. Mature crops are those crops which are mature prior to the expiration of a lease. Generally, tenants have the right to crops and a reasonable time within which to remove them based on the principle that after termination of a lease the tenant has a reasonable time in which to take away his personal effects. *Opperman v. Littlejohn,* 98 Miss. 636, 54 So. 77. The crops Gorden planted were mature crops when the lease terminated, therefore under this doctrine he may have a reasonable time within which to harvest them.

■ However, the doctrine of emblements also differentiates rights under leases which expire and those which terminate before expiration.

> It is the general rule that if one's estate in land comes to an end at a time which he could not have previously ascertained, without his fault, and without any action on his part to bring about such result, he is entitled to take the annual crops planted by him before the termination of such estate. This right is ordinarily referred

to as the right or doctrine of 'emblements'....

*Strand v. Boll*, 44 S.D. 228, 183 N.W. 284, 285 (1921).

When the lease terminates due to some wrongful act of the tenant, courts have held one of two ways. One line of cases distinguishes between the crops planted before and those planted after the tenant's forfeiture. In *Collier v. Cunningham*, 2 Ind.App. 254, 28 N.E. 341 (1891), a lease contained a condition against assigning an interest in land to a certain person. The tenant sold his interest in his growing wheat to that person. The landlord ejected the tenant, and attempted to seize the wheat. The court noted that the tenant's transfer to the third party occurred after he had planted the wheat. The court held,

> There is no doubt that where ... the plaintiff in ejectment recovers the land he is entitled to the crops thereon growing ... which were planted after the action was commenced.... But this rule does not apply to crops planted by the lessee in possession before the commencement of the action, and therefore the recovery by the appellee in the action of ejectment did not carry with it the right to wheat sown by her tenant the fall previous to the action.

2 Ind.App. at 262, 28 N.E. 341. The court cited a Wisconsin case, *McLean v. Bovee*, 24 Wis. 295, 1 A.R. 185 (1864), in support of its holding. In the *McLean* case the court held that one who receives land in ejectment is entitled to the crop thereon partly cut and partly uncut which is planted after the action is commenced. No authorities were cited by the court and the case has not been followed since.

The Oregon courts hold that if a tenant commits a forfeiture, the landlord recovers the crops no matter when they were sown. In *Frances Bros. v. Schallberger*, 137 Or. 529, 3 P.2d 530 (1936), the tenant sowed the premises with wheat and gave a promissory note to the plaintiff secured by the crops on January 13, 1930. On February 28, 1930, the tenant was in arrears on rental payments and the landlord repossessed and

rerented the land. The new lessee harvested the crops. The court explained,

> Plaintiff also contends that under the doctrine of emblements, the growing crop in question belonged to the tenant. The whole law of emblements, it has been said, is based upon two grounds, public policy and natural justice and equity. Upon the first ground, says Blackstone, the encouragement of husbandry ... being a public benefit.... the second ground is based upon the principle that the tenant is justly entitled to gather his crops, even though his term has expired, and without regard to the question whether such crops are to be considered as in the nature of personalty or realty.... Where the reason of the doctrine fails, it has no application, as where a tenant terminates his estate through his own fault or misconduct.

3 P.2d at 537. The court in *Falk v. Amsberry*, 279 Or. 417, 569 P.2d 558 (1977) relied upon *Frances Bros.* in holding "termination of the lease by the tenant's breach works a forfeiture of the right to emblements." 569 P.2d at 560. *See also Myer v. Roberts*, 50 Or. 81, 89 P. 1051 (1907).

Other courts categorize crops according to each crop's maturity. In *Hecht v. Dittman*, 56 Iowa 679, 7 N.W. 495 (1880), the defendant had entered into a lease for a farm. The landlord had given a mortgage to the plaintiff on the farm, and the plaintiff foreclosed. At the time of foreclosure defendant's grain was not cut, but was ready to be harvested. The court held,

> Where at the time of the expiration of the period of redemption and making of a sheriff's deed, the mortgagor's crops grown thereon have fully matured and are ready to be cut, the title thereto will not pass with the land under the sheriff's deed, but will be treated as personalty....

7 N.W. at 495. The court's rationale was that once grain is mature the course of vegetation has ceased, and the soil is no longer necessary for its existence. (The court added, "[c]ounsel for defendant in-

sists that, as defendant was in the adverse possession of the land, the action of replevin will not lie to recover the grain.... We hold that defendant's right of property in the grain accrued when the grain matured, whether he did or did not hold adversely to the plaintiff after the sheriff's deed was executed." 7 N.W. at 496.) *See also Koerner v. Wilson,* 85 Colo. 140, 274 P. 737 (1929) which held that, "[m]atured and ripened apples, whether upon the ground or upon the trees are, under the circumstances of this case, *fructus industriales* and properly the basis of an action in trover."

The Arkansas courts categorize crops according to whether the crops have been severed or not. In *Kelly v. Weir,* 243 F.Supp. 588 (E.D.Ark.1965) the court held;

> In Arkansas growing crops are deemed to be real property in the absence of a constructive severance. After actual severance from the soil they are deemed to be personalty. A trespasser or adverse holder of land has no title to growing crops as against the owner of the land, but after severance such trespasser or holder has good title to crops actually produced and harvested by him so that his vendee or mortgagee takes free from any claim of the landowner. The trespasser or adverse holder is, of course, liable personally to the owner of the land for rent.

243 F.Supp. at 599–600. *See also Western Telegraph Company v. Bush,* 191 Ark. 1085, 89 S.W.2d 723 (1936).

Wisconsin's present statutes and case law uniformly characterize crops as personalty. Wisconsin's Uniform Commercial Code ("U.C.C.") in both the article on sales and the article on secured transactions, treats growing crops as personal property by labelling crops as goods. WIS.STAT. § 402.107 provides:

> (2) A contract for the sale apart from the land of growing crops or other things attached to realty and capable of severance without material harm thereto ... is a contract for the sale of goods within this chapter whether the subject matter is to be severed by the buyer or by the seller even though it forms part of the realty at the time of contracting, and the parties can by identification effect a present sale before severance.

Other courts applying this U.C.C. provision have consistently found crops to be goods. *Cargill v. Hale,* 537 S.W.2d 667, 19 U.C.C. Rep.Ser. 1059 (Mo.App.1976), *Campbell v. Yokel,* 20 Ill.App.3d 702, 313 N.E.2d 628 (1974), *Decatur Corp. v. Urban,* 219 Kan. 171, 547 P.2d 323 (1976). WIS.STAT. § 409.102 provides; "this chapter applies so far as concerns any personal property and fixtures within the jurisdiction of the state." WIS.STAT. § 409.105(1)(f) provides "goods also include the unborn young of animals and growing crops...."

Wisconsin case law also regards crops as personal property. The court in *Jens v. Habeck,* 259 Wis. 338, 48 N.W.2d 473 (1951), held that the lower court had rightly concluded, "that the Uniform Sales Act has changed the law in Wisconsin so that industrial growing crops ... 'attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale' are to be considered 'goods' and are consequently personal property...." 48 N.W.2d at 474.

In *In Re Kohl,* 11 B.R. 470 (Bankr.W.D. Wis.1981), the plaintiff, a creditor of the debtor, filed a complaint to declare a debt nondischargeable on the ground of false representation alleging that the debtor sold crops to the plaintiff and kept the proceeds without disclosing a prior agreement with a third party. This court held, "[i]t is unnecessary to determine whether the present case fits within § 551 Restatement of *Torts* (Second) and Wisconsin real estate cases applying that section because the present case involves personal property. Therefore, the U.C.C. may be applied." 11 B.R. at 472.

■ In *McLean* the court appears to have been applying the doctrine of emblements. If so, the holding recognizes that growing crops are personal property of the tenant, unless the tenant defaults on the lease. In that case, only those crops planted before the action was commenced be-

long to the tenant. Since Gorden obviously planted the corn prior to December, 1983, the crops under the doctrine of emblements were his personal property.

■ Determining that Gorden retained an interest in the crops after the termination of the lease does not dispose of this case. The Fruins assert that the PCA's security interest in Section 10 of their farmland was not perfected until the PCA corrected the mistake in the security agreement on January 6, 1983. The Fruins argue that the PCA's perfection may be avoided as a preference under 11 U.S.C. § 547, in that the perfection constituted a "transfer of an interest of the debtor in property" and was made within ninety days prior to Gorden's bankruptcy filing. Neither Gorden nor his trustee, however, have instituted an action to avoid the preference on behalf of the estate. The Fruins, as individual creditors who we have determined to have no interest in the crops or their proceeds superior to Gorden, wish to bring the preference action themselves.

Courts have routinely granted creditors' committees standing to institute adversary proceedings, including preference actions. Some courts have held that creditors' committees have an implied power to sue under the Bankruptcy Code. In *In Re Monsour Medical Center*, 6 B.C.D. 886, 5 B.R. 715 (Bankr.W.D.Pa.1980), the court held that the creditors' committee had implied authority to bring suit to avoid preferences or fraudulent transfers. The court explained

Express authority for a creditors' committees to bring suit to recover a preference is not found in the Bankruptcy Code. Under Chapter 11 of the old Bankruptcy Act, however, implied authority to sue was an important form of creditor protection in cases where a trustee (or debtor-in-possession) unjustifiably failed to bring suit, and where the Court granted the creditors' committee the right to sue on behalf of the trustee (or debtor-in-possession).

6 B.C.D. at 888, 5 B.R. 715. In *In Re Gander Mountain, Inc.*, 29 B.R. 260 (Bankr.E.D.Wis.1983), the court held, "[a]

creditors' committee is clearly a party in interest with a right to appear on any issues raised in a Chapter 11 case. Furthermore, a creditors' committee has standing, in the proper circumstances, to bring an action against a creditor even though the debtor is not an active party to the action." 29 B.R. at 262 (footnotes omitted). The court found that the recovery of preferences by the creditors' committee was allowed because it was implicit in the confirmed plan. (The court added, "an order specifically granting the creditors' committee full authority to sue to recover preferences on behalf of the debtor could have been entered prior to the effective date of the reorganization plan." 29 B.R. at 263.)

Other courts have predicated the creditors' committee's power to sue on 11 U.S.C. § 1109. The court in *In Re Joyanna Holitogs, Inc.*, 21 B.R. 323 (Bankr.S.D.N.Y. 1982), held that a creditors' committee had authority to file a preference action on behalf of the debtor. It was explained,

Section 1109(b) continues the broad concept, carried over from the 1898 Act, of the broad right to be heard in order to insure that the dark corners of commerce are illuminated.... [T]he right to be heard given the creditors' committee, 5 *Collier on Bankruptcy* (15th ed.) ¶ 1109.02[3], includes the right to sue where a trustee or debtor in possession will not. To hold otherwise would frustrate Congress' decades-old effort to limit a debtor's generosity with its assets.

21 B.R. at 326. In *In Re Chemical Separations Corp.*, 32 B.R. 816 (Bankr.E.D. Tenn.1983), the court held, "Code § 1109(b) does permit a creditors' committee to initiate an adversary proceeding against an insider when a debtor in possession declines to do so due to extenuating circumstances." 32 B.R. at 819 (footnote omitted). There the creditors' committee was suing for determination of an amount of an allowable claim of a creditor. In *In Re Jermoo's Incorporated*, 38 B.R. 197 (Bankr.W.D.Wis.1984), a creditors' committee filed an adversary proceeding to avoid the termination of contracts as fraudulent

 

transfers under section 548(d)(2). Both a creditor and the debtor were defendants. This court held

Under the Code, a creditors' committee in a chapter 11 case, as a 'party in interest' 'may raise and may appear and be heard on any issue in a case under this chapter.' 11 U.S.C. § 1109(b). Unless 'raise' excludes the usual means of bringing an issue to the attention of the court by motion or complaint, the plain language of the statute grants 'standing' to the Committee to bring this action.

38 B.R. at 199.

Numerous cases have recognized that avoiding preferences under section 547, is a duty of the trustee or debtor in possession in a chapter 11 case. However, there are no reported cases dealing with whether an individual creditor has authority to bring an adversary proceeding on behalf of the debtor where the debtor refuses to do so. While some courts have implied that avoiding preferences is a duty of the debtor in possession or the trustee, and therefore might find that a creditor would have the power to force the debtor or trustee to do so, the courts have also placed limits on the creditors' committee's power to bring adversary proceedings. The court in *Monsour*, limited its holding, "[t]he Committee was only authorized to bring suit on behalf of the debtor-in-possession." 6 B.C.D. at 888, 5 B.R. 715. The court in *Chemical Separations*, held only that the committee could initiate an adversary proceeding against an insider, "[t]he commencement of adversary proceedings by a creditors' committee against non-insiders may likewise be permissible on the authority of 11 U.S.C.A. § 1109(b) (1979). However, that is not the precise question before the court." 32 B.R. at 819 n. 5. Other courts have held that the creditors' committee must first obtain permission from the court to initiate the action. *In Re Segarra*, 14 B.R. 870, 878, 8 B.C.D. 339, 344 (Bankr.D.P.R.1981). But no court has found that members of the creditors' committee, such as Fruins are, may maintain an avoidance action on their own behalf. Absent any authority for such

a step I can not authorize Fruins to proceed now against Production Credit Association.

Judgement may be entered consistent with this opinion, dismissing the plaintiffs' complaint.