In re Steven L. NORTON, Carol L.
Norton, Debtors.

Robert L. SULLIVAN,
Trustee, Plaintiff,

v.

Steven L. NORTON, Carol L. Norton,
Emma Stewart, Defendants.

No. 88–3143.

United States District Court,
C.D. Illinois,
Springfield Division.

March 29, 1990.

Joseph M. Ambrose, Bloomington, Ill.,
for plaintiff.

Mark T. Dunn, Bloomington, Ill., for defendants.

## OPINION

RICHARD MILLS, District Judge:

Bankruptcy appeal.

At issue: landlord's portion of a crop share lease.

Here, the Debtors' landlord, Emma Stewart, contends that when—prior to rejecting a lease of farmland and in "timely perform[ing] all the obligations of the debtor" pursuant to 11 U.S.C. § 365(d)(3)—the trustee harvests growing crops, he must also pay to the landlord her entire share of the harvest as one of those obligations.

Predictably, the trustee disagrees; while acknowledging that payment of rent for the period between the filing of the petition and the rejection of the lease is an obligation, he also contends that that does not include payment of the entire sum due under the lease, but rather only an apportioned amount.

After fully considering the parties' written submissions and entertaining oral argument on this issue, we have now reached our decision. Although we initially leaned in favor of the landlady's position, we have come full circle and now hold that the trustee's position is the correct one.

Accordingly, that portion of the bankruptcy court's ruling is affirmed.

### Background

On January 18, 1985, Emma Stewart leased to the Debtor, Steve Norton, approximately 70 acres of farmland in McLean County, Illinois, on a crop share basis. The original lease term was from January 18, 1985, until December 1, 1985. The agreement itself does not specify, but the parties and the bankruptcy court have all agreed that the rental amount for the farmland was 50% of the crops harvested. Among other things, the landlady and the Debtor were to equally share in the costs of limestone, commercial fertilizer and insecticides; the Debtor alone, though, bore financial responsibility for any herbicides. Additionally, the Debtor was called upon to perform the usual duties of a tenant farmer, including controlling noxious weeds,

keeping waterways and tiles in good repair, and the like; he was also obligated to "clean barn once or twice a year whichever Emma wants," and to "pick a wagon load of corn if she desires." Finally, the lease required the Debtor ·

> to store, at the option of the Landowner, as much of the Landowner's share of the crop as possible, using one-half of the space provided by the Landowner, in cribs, granaries, or barns on the farm, and to deliver such share in such manner as directed by and without cost to the Landowner to Kemp Grain....

The lease is silent as to precisely when the grain was to be delivered to Kemp Grain.

Apparently the parties decided to renew the lease the following year (and so by its own terms the lease became one from year to year), because the Debtor planted corn and soybeans again on the land. All did not go well for the Debtor in 1986, though, and he filed a Chapter 11 petition on August 22 of that year, which was converted to a Chapter 7 proceeding on September 9 on the Debtor's motion. Also on September 9, the trustee was appointed.

The 1986 crop was about ready for harvest when the Debtor filed for bankruptcy protection, and on authority of § 365(d)(3) the trustee made arrangements for another farmer to harvest the crop. Soybeans were cut on September 10 and 15; these were delivered to Kemp Grain Elevator and sold for $2,922.25. The corn was harvested on October 15 and 16, and it too was taken to Kemp Grain and sold, netting $1,408.22.

The lease between the Debtor and Stewart was rejected by operation of law 60 days following the filing of the petition in bankruptcy, and so was rejected on November 8. Section 365(d)(1). On October 23, the trustee filed an adversary proceeding seeking to avoid Stewart's statutory crop lien and to preserve the crop for the benefit of the estate. Stewart responded by arguing that the trustee had actually assumed the lease by virtue of his having the crop harvested; she has since abandoned this argument. Stewart also claims, though, that the entire amount of rent is due to her as a cost of administration pursuant to § 503(b)(1)(A), as an actual and necessary expense of preserving the estate. The bankruptcy court held that the lease had not been assumed by the trustee, but agreed that Stewart should file a petition for an administrative claim for rent due and owing during the period following the petition but before rejection of the lease.

Stewart filed her petition for payment of an administrative claim, seeking alternatively the entire crop less the estate's *quantum meruit* claim for the services rendered by the Debtor and/or the estate, or for her own *quantum meruit* recovery determined by reference to the lease; either way, Stewart calculated that she was owed half the crop. The bankruptcy court took a different view, though, and held that Stewart was entitled to an administrative claim of only the actual number of days the trustee used the farm following the filing of the petition. The bankruptcy court determined that the claim should be calculated with reference to a fraction representing the fractional part of the total proceeds from the crops (which it deemed to constitute the rental price for the farm for the lease period) to be allocated to the trustee's possession of the farm. Using a denominator of 365 (representing the total lease period for which the rental was figured), the bankruptcy court determined that the numerator for the corn transaction was 36 (representing the number of days between conversion of the case to Chapter 7 and the harvest of the corn), and for the soybean transaction was 6 (similarly representing the number of days between conversion and the harvest of the soybeans). The bankruptcy court therefore held that Stewart's administrative claim for the corn was 36/365 of her one-half of that crop's proceeds, or $71.42, and for the soybeans was 6/365 of her one-half of that crop's proceeds, or $12.01; the total administrative claim was calculated to be $83.43.

Stewart was predictably displeased with this result, since she contended entitlement to one-half of the proceeds of both crops, or $2165.24. This appeal ensued.

*Discussion*

Stewart has raised three issues on appeal, two concerning her right to recover half the proceeds and the third concerning the bankruptcy court's calculations. We will discuss these separately. Neither Stewart nor the trustee contend that the bankruptcy court's findings of fact are clearly erroneous, and so we will accept these in their entirety. Bankruptcy Rule 8013. Our review of all legal issues, however, is *de novo*. *First National Bank of Lincolnwood v. Levine*, 735 F.2d 1029, 1031 (7th Cir.1984).

Stewart's *first* argument is her most complicated, and involves the interplay of several Bankruptcy Code provisions. To start at the beginning, when the Debtor filed his Chapter 11 petition a bankruptcy estate was created which consisted, *inter alia*, of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). At that time, this included the Debtor's interest in the Stewart lease. Upon appointment, the trustee stepped into the Debtor's shoes with respect to that lease; § 365(d)(1) gave the trustee 60 days from his appointment to either assume or reject the lease, and his failure to affirmatively assume within that period resulted in the automatic rejection of the lease after 60 days. Of course, prior to that rejection—but after the filing of the petition—the trustee caused the crops upon the leased property to be harvested. This was in accordance with § 365(d)(3), which requires that

> the trustee shall timely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential property, until such lease is assumed or rejected....

This all seems simple enough, but that is but an illusion, because § 365(g)(1) provides that

> ... the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease —(1) ... immediately before the date of the filing of the petition.

Applied here, § 365 variously states that by virtue of the trustee not assuming the lease it was automatically rejected on November 8 (60 days after the trustee's appointment), and that this rejection constituted a *nunc pro tunc* "breach" of the lease back on August 21 (the day before the petition was filed), notwithstanding that the trustee harvested the crops in September and October as one of the "obligations of the debtor" required to be timely performed.

On August 21—the day the lease was "breached"—the crops were still standing. Stewart argues that in Illinois crops are considered part of the real estate until severance, and so at the "breach" the title to the leased property reverted to her, which included full title to all the crops. She explains that if (or since, under the Bankruptcy Code) the Debtor had no title or rights to the leased premises or growing crops on August 21 following the "breach," the trustee had no right either—in short, neither the crops nor the leased realty ever became "property of the estate" since the Debtor had no interest in these. Stewart contends that at best the trustee is entitled to the Debtor's "equitable interest" in the crops, which is only a *quantum meruit* amount for labor and materials expended in growing and harvesting the crop (magnanimously, she agrees that this would equal the Debtor's one-half share of the crop under the lease).

This argument fails to sway because it assumes that the lease was terminated between the Debtor and Stewart on August 21 by virtue of § 365(g)(1), while in fact all that section speaks of is a "breach." A "breach" under § 365(g)(1), though, is just that—a breach, and nothing more. *See Societe Nationale Algerienne v. Distrigas Corp.*, 80 B.R. 606, 608–09 (D.Mass.1987), *In re Storage Technology Corp.*, 53 B.R. 471, 473–75 (Bankr.D.Colo.1985), *Blue Barn Associates v. Picnic 'n Chicken, Inc.*, 58 B.R. 523, 525–26 (Bankr.S.D.Cal. 1986), and *Blackburn v. Security Pacific Credit Corp.*, 88 B.R. 273, 276 (Bankr.S.D. Cal.1988). To be sure, there exists a conflict between the cases as to whether a

rejection will effectuate an eventual termination of a lease, with *In re Storage Technology Corp.* leading the above-cited cases in holding that "rejection of a lease does not have the conclusive effect of terminating the lease," *id.* at 475, while *Commercial Finance, Ltd. v. Hawaii Dimensions, Inc.*, 47 B.R. 425, 427–28 (D.Hawaii 1984), and *In re Giles Associates, Ltd.*, 92 B.R. 695, 696–98 (Bankr.W.D.Tex.1988), carry the flag for the view that "rejection of [a] lease operates to terminate the lease." *Hawaii Dimensions, Inc.*, 47 B.R. at 427. We need not choose between these positions, though, because the termination occurred, if at all, on November 8—that is, 60 days after the trustee's appointment. Our immediate concern, in contrast, is whether a termination occurred on August 21—the day before the petition was filed—and the Bankruptcy Code and cases are clear that on that day a "breach" occurred, but not an out-and-out termination of the lease.

Nor does it appear that the "breach" on August 21 in this case constituted a termination of this contract. Nothing in the lease itself indicates that any breach will precipitate an automatic termination of the lease. Likewise, Illinois law does not suggest that any breach will constitute a breach, or termination, of the entire lease. *See People ex rel. Nelson v. West Town State Bank*, 373 Ill. 106, 111–12, 25 N.E.2d 509 (1940). Hence, it appears that the lease in question was still extant on August 22 when the Debtor filed his petition, and so he had title to the crop (notwithstanding the *nunc pro tunc* § 365(g)(1) breach), which title passed to the estate upon the filing of the petition.

This entire argument by Stewart turns solely upon whether the lease was terminated or not, and the question as to whether crops are realty or personalty prior to severance is simply irrelevant. The Debtor's (and consequently the trustee's) right to possess the entire crop flows from the existence of a landlord-tenant relationship, which all agree was present here, and not from the characterization of the crops as either personalty or realty. Illinois law provides that in crop share leases, rent is not due until the expiration of the lease term, which here was December 1. *Grommes v. Town of Aurora*, 37 Ill. App.2d 1, 7, 185 N.E.2d 3 (2d Dist.1962). Hence, if the lease was extant, neither the Debtor nor the trustee was obligated to pass on to Stewart her share of the crop proceeds until December 1, and so both were possessed of legal title to the entire crop after the harvest. This is true even though a breach occurred on August 21— due to the continued landlord-tenant relationship, the estate received title to the entire proceeds of the crop. Conversely, had the lease terminated on August 21 and the landlord-tenant relationship thereby ceased, all the estate would have gained on August 22 was the bare equitable right to the Debtor's half share of the crop proceeds, and Stewart would have likewise received her entire half share. But this latter scenario is fiction; the fact, as we have already held, is that the lease was not terminated by the action of § 365(g)(1) and so the landlord-tenant relationship survived the filing of the petition. *Compare In re Hoover*, 31 B.R. 432 (Bankr.S.D.Ohio 1983), and *Fruin v. Gorden*, 47 B.R. 245 (Bankr. W.D.Wis.1985).

The *Grommes* case, 37 Ill.App.2d 1, 185 N.E.2d 3, adequately answers Stewart's *second* contention as well, which is that payment of the entire lease amount (i.e. half the crop) is required as an "obligation of the debtor" to be accomplished by the trustee because of § 365(d)(1). Citing *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879 (Bankr.E.D.N.Y.1986), and a plethora of other cases, Stewart notes that among the § 365(d)(1) obligations is the payment of rents which accrue between the filing of the petition and its rejection. Stewart then asserts that here payment of the rent due in that time period includes her entire half share of the proceeds, because the crop was harvested then and was due at harvest. But nothing in the lease requires payment at harvest, and Illinois law, as stated in *Grommes*, provides that in the absence of any such lease provision the entire lease payment is due at the end of the lease period.

In fact, Stewart is lucky that the test is not the actual sums due or payable at the time of harvest—if it were so, then she would be entitled to nothing by way of an administrative expense, because the Debtor/trustee was not obligated to pay anything until December 1. Instead, we think the bankruptcy court correctly held that Illinois rent for crops accrues daily. *Wilson v. Hagey,* 251 Ill. 452, 96 N.E. 277 (1911); *Ralston Purina Co. v. Killam,* 10 Ill.App.3d 397, 293 N.E.2d 750 (5th Dist. 1973). *See also In re Strause,* 40 B.R. 110 (Bankr.W.D.Wis.1984).

We pause to note that the trustee considerably confused this issue by characterizing it as involving application of Illinois' statutory crop lien. According to Ill.Rev. Stat. ch. 110, ¶ 9–316 (1985), "[e]very landlord shall have a lien upon the crops grown or growing upon the demised premises for the entire rent thereof...." Section 545(3) of the Bankruptcy Code, however, allows that "[t]he trustee may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien is for rent." The bankruptcy court agreed with the trustee that § 545(3) nullified Illinois' statutory crop lien, and it is clear that that ruling is correct—in fact, all along Stewart has conceded that it was correct. The trustee, however, argues that Stewart's § 365(d)(3) argument is a mere attempt to resurrect the statutory crop lien.

We were initially intrigued by this argument, sensing that perhaps a conflict existed between §§ 545(3) and 365(d)(3), and we even had the parties address the point during oral argument. Upon reflection, however, we believe the trustee's argument misses the mark. Stewart simply is not claiming entitlement to half the crop under any lien, statutory or otherwise; instead, she seeks her half of the proceeds under § 503(b)(1)(A) as an "actual, necessary [cost and expense] of preserving the estate," as that section has been interpreted in conjunction with § 365(d)(3). Section 545 therefore does not enter the picture at all.

Nevertheless, and to reiterate, Stewart's argument fails to persuade. At oral argument her counsel asserted that payment of her half of the proceeds was due and owing immediately upon severance of the crops, but he pointed to no authority in either the lease or Illinois law which makes it so. And although we noted from the bench that the common practice is to divide the proceeds at the latest when the harvested crop is delivered to the grain elevator (where half would be credited to the landlord's account and half to the farmer's), custom alone does not make it the law. The trustee was required only to perform the debtor's "obligations," § 365(d)(3), and payment of half the crop immediately after harvest simply was not such an obligation. Illinois law instead provides that the rent accrues daily, and although it is true that that law was decided in a non-bankruptcy context, the policies behind the law apply equally here and in any event Stewart has not provided any authority that a landlord has a right to payment at harvest. Hence, all that was due during the post-petition, pre-rejection period was the daily rental value of the land, calculated with reference to the crop proceeds.

In sum, we are left unswayed by either of Stewart's arguments that she is entitled to one-half the proceeds as an administrative expense.

Stewart's *third* argument addresses the bankruptcy court's calculation of her administrative claim. Because the rent accrues daily, and because § 503(b) only requires payment of rent which accrues between the filing of the petition and the rejection of the claim, we hold that the equation used by the bankruptcy court was correct: 365 is the denominator (representing the full length of the rental term), and the numerator is the number of post-petition days during which rent accrued. Stewart's allowed administrative expense is therefore the fraction of allowed accrued rent divided by the full rental term multiplied by one-half of the proceeds of the crop (the rental amount). A simple illustration may help: Assume the crop netted $2,000; half of this would represent the rental price for the year. Also assume that the lease was rejected exactly 60 days following the filing of the petition. Hence,

the landlord would be entitled to 60 days' worth of rent, or 60/365 of $1,000.

The bankruptcy court correctly applied this equation, but used the wrong numbers. The bankruptcy court calculated the period of post-petition tenancy as running from the date the case was converted to a Chapter 7 proceeding (September 9), but § 348(a) makes clear that the original Chapter 11 filing date of August 22 is to be used. The bankruptcy court further held that the number of post-petition days to be allowed are the number of days the trustee "uses" the farm, and this is correct, but the bankruptcy court also calculated that period as ending upon harvest. The crop rental accrues daily, however, so it seems clear that the time during which the trustee "used" the farm ran until the lease was rejected, which here was not until it was automatically rejected on November 8. Hence, the correct calculation should use a fraction with the number of days between August 22 and November 8 (78 days by our calculation) as the numerator and 365 as the denominator, and this fraction should be multiplied by one-half of the total proceeds of $4,330.47.

### Caveat

We acknowledge, as did the bankruptcy court, that this case seems troubling due to its apparent harshness. A crop share lease only results in one rent payment, which ordinarily is not made until near the end of the lease period and which, absent lease provisions to the contrary, is legally not due until the last day of the lease. A bankruptcy petition filed prior to payment of the crop share results in most of the landlord's claims falling into the general unsecured creditor category. The nature of the leases, though, makes it difficult for landlords to collect rent any more often, and perhaps Congress should consider fine tuning the Bankruptcy Code to deal with this special category of lease. Until then, we are bound to treat the crop share lease as just another unexpired lease, and so to reach the result arrived at today.

In the interim, there are steps landlords can take to protect themselves. As the bankruptcy court noted, farm landlords could secure their rent claims by perfecting Article 9 security interests in the crops; here, unfortunately, Stewart did not go that extra distance. Nor did Stewart arrange her affairs to create a sharecropping arrangement rather than a landlord/tenant relationship, which would have made the debtor her employee and thus avoided the issue of the effect of rejecting the lease. *See Matter of Hilligoss*, 849 F.2d 280 (7th Cir.1988). It must be remembered that bankruptcies work hardships, and the most likely group to suffer the worst hardships are unsecured creditors. That was exactly Stewart's status in this situation, and the equities of the situation, such as they are, do not change the legal realities.

*Ergo*, the bankruptcy court's ruling is AFFIRMED IN PART and REVERSED IN PART, and this case is REMANDED for further proceedings in conformance with this order.

Case CLOSED.